IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-225

Filed: 2 January 2019

Wake County, No. 17 CVS 1819

NORTH CAROLINA FARM BUREAU MUTUAL INSURANCE COMPANY, INC.,
Plaintiff,

v.

CRYSTAL HAMNER COX, JOSEPH CAIN PICKARD, and JESSICA
LITTLEFIELD, Defendants.

Appeal by Defendant Jessica Littlefield from orders entered 12 September
2017 by Judge Carl R. Fox in Superior Court, Wake County. Heard in the Court of
Appeals 17 September 2018.

*Young Moore and Henderson, P.A., by Walter E. Brock, Jr. and Andrew P. Flynt, for Plaintiff-Appellee.*

*Douglas S. Harris for Defendant-Appellant Jessica Littlefield.*

McGEE, Chief Judge.

I. Factual and Procedural Background

Jessica Littlefield ("Littlefield") appeals from an order entering summary

judgment for North Carolina Farm Bureau Mutual Insurance Company, Inc. ("Farm

Bureau") and from an order denying Littlefield's motion pursuant to Rule 60(b) and

Rule 55 to set aside entry of default with respect to the other parties named as

defendants in this action. We reverse the order granting summary judgment.

Because summary judgment was granted in favor of Farm Bureau and we are construing an insurance policy, we present the alleged facts that support Littlefield's argument as true, and we present them in the light most favorable to Littlefield. *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C.*, 364 N.C. 1, 7, 692 S.E.2d 605, 611 (2010); *Austin Maint. & Constr., Inc. v. Crowder Constr. Co.*, 224 N.C. App. 401, 408, 742 S.E.2d 535, 541 (2012). These alleged facts are taken from the pleadings, depositions, and other materials considered by the trial court, and they are presented in great depth and detail due to the unique nature of the present case and appeal. The issues involved in this appeal arise from events that occurred on 11 and 12 June 2013, including a sexual assault of Littlefield by Joseph Cain Pickard ("Pickard") that resulted in Pickard pleading guilty to taking indecent liberties with a child ("the events"). The following, therefore, are solely the alleged facts, and reasonable inferences therefrom, that support Littlefield's argument. Although we present Littlefield's version of the alleged facts as "true," this should not be viewed as an endorsement of these allegations.

Littlefield was a fifteen year-old girl raised in a religious family with very strict rules who, in June of 2013, lived with her mother Darie Wyatt ("Wyatt") and sisters in Greensboro. Because Littlefield's "mom [was] very religious," Littlefield had led a very sheltered life. Wyatt testified: "I have a policy that my girls don't spend the night away from home. I don't care if they have 10 friends spend the night with them

[at my house], but they don't spend the night away from home." Wyatt's rules for Littlefield were: "No boys, no alcohol, no drugs, [no supervising adult could go to sleep] until [Littlefield was] asleep," and she "wasn't allowed to go outside . . . past dusk without an adult." Littlefield had never consumed any alcohol or used any kind of illegal drugs.

In June 2013, Wyatt needed to help care for a close family friend in Virginia who was dying of cancer.[1] Because Wyatt would not leave Littlefield home alone, she planned to take Littlefield with her as she commuted back and forth to Virginia. A classmate of Littlefield's, C., invited Littlefield to stay with her during this difficult period. C. lived with her mother, Crystal Hamner Cox ("Cox");[2] Cox's husband—C.'s stepfather; and her sister. However, unbeknownst to Littlefield or Wyatt, Pickard, Cox's nearly twenty-one-year-old son, had just been allowed to resume living in Cox's house ("the house" or "Cox's house") after a long period of banishment. Wyatt was familiar with both Cox and C.—from Littlefield's school, and because C. had spent the night with Littlefield at Wyatt's home on several occasions. Wyatt spoke with Cox several times on the phone, deliberating whether to allow Littlefield to spend the night away from home without supervision from any adult family member.

---

[1] Littlefield referred to this family friend as her "grandmother."

[2] Although all the pleadings and other court documents, as well as the briefs of both parties, refer to this Defendant as "Crystal Hamner Cox," in her deposition "Cox" testified that her name at birth was "Crystal Lee Hamner," and that she had never changed it. It is unclear why her last name is referred to as "Cox" throughout the record, but in order to conform with the record, we will continue to refer to her in this manner.

Because Wyatt was strict and protective, she always had long discussions with any adult who might be supervising Littlefield—even for short periods of time during the day—in order to determine if they would abide by her rules. Wyatt was not hesitant to refuse to allow Littlefield to spend time with her friends if Wyatt was not confident her rules would be followed. In Wyatt's conversations with Cox, she thoroughly explained her rules and expectations, and gave Cox "clear examples of what was not permitted." Wyatt testified that Cox assured her "that's no problem. There's no one here. There's no one going to be here, just me, my husband, and the girls. I don't work. It'll be fine." Based upon Cox's repeated assurances, Wyatt finally agreed to permit Littlefield to stay overnight at Cox's house. Specifically, Cox's assurances that Cox would closely supervise Littlefield; that Littlefield would not be allowed to fraternize with any boys, even under Cox's supervision; that there would be no alcohol or drugs consumed around Littlefield; and that Cox would not allow Littlefield to become involved in any kind of inappropriate behavior. Neither Wyatt nor Littlefield knew that Cox had an adult son, much less that he would be sleeping at the house. Littlefield's stay at Cox's home on 11 and 12 June 2013 "was the one and only time [Wyatt] ever let [her] stay at anyone else's house."

Cox met Wyatt at a parking lot, halfway between Greensboro and Cox's house in Gibsonville, to pick up Littlefield. At this parking lot meeting, Wyatt again discussed, in Littlefield's presence, all Wyatt's rules and expectations. Cox reassured

Wyatt that Cox would follow her rules, and that Littlefield would be in a safe and constantly monitored environment. Littlefield testified that, during this conversation, Cox reassured Wyatt that the only other occupants of Cox's house that night would be Cox, Cox's husband, and Cox's daughters—and that Cox would provide close adult supervision throughout the night to make sure there was not any "mischief." Cox assured Wyatt and Littlefield that there would be "no alcohol and no boys, that they were not expecting any visitors, and that they [Cox and her husband] would not be leaving for any purpose." Cox told Wyatt she would be with the girls constantly, and that they "were going to watch Disney movies that night." Cox "said there was never a lot of riffraff in her house. She had two little girls, so she didn't like drama in her house. So we were just going to be relaxing."

Cox testified that all three of her children, including Pickard, had "special needs," but it is unclear what Pickard's "special needs" were. However, it is clear Pickard had a troubled past. Cox testified Pickard started dating his girlfriend when they were both sixteen, and that Pickard "left home at 16 and [had] not returned."[3] Cox believed Pickard's relationship with his girlfriend to be a source of Pickard's defiant behavior. Cox "didn't see a whole lot of [Pickard] for a long time" after he left her house when he was sixteen. Cox "worried" about Pickard over the years because when she spoke with him on the phone she "could tell that he was drinking." Cox

---

[3] Cox seemed to have been testifying in a more general sense, as it is clear that Pickard had returned to live in Cox's house on trial bases at least twice prior to Cox's deposition.

stated that "[b]y this time . . . it kind of became apparent that, you know, he was drinking. And it didn't matter what I did or what I said . . ., he was going to drink." Despite the fact that Cox tried to intervene, "even when the kids were in high school[,]" she could not control Pickard's drinking problem. Cox agreed that Pickard's drinking was "really far in excess[,]" and stated "you know, when you have someone drinking at the age that he was, not compliant at all with house rules, . . . it was worrisome. It was worrisome."

Cox testified that at some point in time before 11 June 2013, "for whatever reason, problems at [his girlfriend's] house, [Pickard] asked if he could come home." Cox let Pickard return home, but would not allow his girlfriend to enter the house. When Pickard did move back home "he wasn't the same. He wasn't the same." Pickard kept drinking, and Cox "tried everything[;]" she tried to reason with him "so many different ways." She told him: "'We can't have this. We can't have this at the house. It's not good for your sisters.'" Finally, Cox made a compromise with Pickard because "compromise is what adults do." Cox told Pickard that his girlfriend could come to the house, but that she had to leave by "'8:30 or when we [Cox and her husband] go to bed.'" Although Cox believed she had compromised to reach a mutually acceptable solution, she testified that "unfortunately, I was the only one giving all the time. So [Pickard's girlfriend was again totally banished from the house, and] had not been allowed really in the house for a year." Pickard was also

either banned from sleeping in the house for most of this period, or had voluntarily removed himself, until just before 11 June 2013. Pickard "had been staying with his grandparents, . . . and then . . . there was some argument that required him to leave there" and so he "went back to [Cox's] house and was only there" a few days before 11 June 2013.

Cox "feared that [Pickard] would drink too much and die. . . . . I was afraid that . . . he gets belligerent towards the wrong person and gets really hurt." At the hearing for Pickard's guilty plea for taking indecent liberties with a child, Pickard, through his attorney, admitted that he was a heavy drinker, and "in certain respects he has a serious alcohol addiction[.]" Pickard's attorney further stated: "I think everybody in his family would concur that things were just spiraling in a very downward direction as far as [Pickard] was concerned in terms of both the substance abuse issues and just the instability that he was finding himself in at that time."

Cox testified that Pickard's alcohol of choice was "hard liquor such as vodka[.]" She stated that she did not permit him to drink in the house, but she knew that he ignored her and regularly drank when he was staying at her house. Cox would know when Pickard had been drinking "[b]ecause he would become belligerent" "and angry acting[.]" When he was drinking, "[h]e would yell[,]" and sometimes "he would just kind of get in my face and those types of things." "There was one point he decided he wasn't going to listen to me anymore and shoved past me and slammed the bathroom

door like he was a two-year old, . . . those types of things." Pickard would often leave his liquor in his girlfriend's car when the car was parked in front of the house, go out to drink it there, "and com[e] in and act[] belligerent[.]" Cox knew that Pickard had been arrested for possession of marijuana and paraphernalia prior to 11 June 2013.

When asked if she would expect to be warned if C. was going to spend the night at a house with a twenty-year-old man who had problems with alcohol, belligerence, and abiding by rules, Cox initially demurred. Cox rationalized her failure to inform Wyatt or Littlefield about Pickard's issues by saying that Pickard "was good when he was good. He was really good." She admitted, however, that Pickard was also "bad when he was bad." Cox further rationalized that she anticipated better behavior by Pickard on 11 and 12 June 2013 since he had only just been allowed back in her house, stating: "So, you know, he was trying to be good. And I don't know what happened after I went to bed [on the night of the events], but that situation changed."

While at Cox's house on 11 June 2013, Littlefield and C. played video games in C.'s bedroom for a while until Cox fixed dinner for the girls. Cox first mentioned Pickard while they were in the kitchen, saying that he was a "troubled child" with a history of "acting out[,]" who "do[es] bad things." This was when Littlefield learned C. had a brother. Pickard arrived at the house with his girlfriend and some other people while Littlefield was still eating, though initially none of them entered the house. She heard "a lot of noise in the back [yard] and things like that." She could

- 8 -

tell that there were a number of people in the back yard, and Cox told Littlefield that "they were out in the back, having a little party" by the fire pit. Pickard came into the house through the back door and had a brief conversation with Cox in the kitchen. According to Littlefield, Cox told Pickard "not to do anything to crazy but to have fun." At approximately 8:30 p.m., Cox announced that she was going to bed, and she and her husband went into their bedroom and locked the door. Littlefield could hear people outside, and heard multiple male voices "hollering and going on" near the fire pit.

When C. finished eating, she returned to her room to chat with people on her computer, leaving Littlefield alone in the kitchen. At some later time, Pickard came into the kitchen carrying a large clear bottle containing a clear liquid. Littlefield did not know what the liquid was, but Pickard "smelled like alcohol" so she assumed it was vodka. Pickard appeared to be intoxicated and "[h]e looked high. He looked like he was up on something, jittery, wide-eyed." Pickard's eyes were "[v]ery glassy . . . but wide, really jittery like – not just like normal jitters, . . . shaky and like too much energy almost, and very high[,]" "very, very, very high."

Pickard sat down next to Littlefield on one of the bar stools at the kitchen counter, and he "smelled like weed." He started talking to Littlefield about his difficult childhood, and told her that "he had weed and how he had a history of cocaine usage, just bragging." Pickard said that "from a young age he really didn't care about

school. He would just go out and get really drunk and get really high[,]" and that when he did so "he'd get in trouble." Pickard told Littlefield that he had been "thrown in the back of a couple of cop cars when he'd go out and act out." Outside, Littlefield could hear "whooping and hollering and listening to music, getting high and drunk[,]" like "how boys get along, screaming obscenities, acting out, running around." Pickard offered Littlefield some of the clear liquid she believed was vodka, but she declined.

Littlefield was thirsty, so she started to get up to go to the refrigerator, but Pickard offered her a can of Sprite. Although it was open and not full, she did not want to appear rude so she took "a big gulp." The drink tasted "funny." She did not believe it smelled like alcohol, or tasted "that off[,] [b]ut . . . it tasted weird[,]" "like somebody put something in it." Pickard told her maybe it had been open for too long and was "just flat[.]" Littlefield did not drink any more from the Sprite can, but she began to feel strange soon after. Pickard left the kitchen, and Littlefield could hear Pickard and his girlfriend screaming at each other in the front yard. When Littlefield tried to get up and off of the stool, she "went right back down." Littlefield felt certain that Pickard had put something in the can of Sprite. Her "mind was really blank" and when she tried to get off the stool again she "fell off it[.]" She stated I: "kind of like drug myself . . . towards the [back] door because there was cold air out there. And I felt really, really sick." She stated that she "was really dizzy and nauseated," that she "had a hard time moving," that she "felt too hot and like [she] just needed to

get some cool air." She further stated that "it was like somebody turned up the lights and started taking flashing pictures[,]" and all she could see "was bits and pieces."

There was a laundry room area connecting the kitchen to the back door. As Littlefield was dragging herself toward the back door, she was feeling sick, confused, and frightened, so she "just kept hollering" for help, but nobody came. Littlefield further stated that "[she] got scared" because Pickard and his girlfriend "were screaming." Because nobody came when she yelled for help, Littlefield continued to the back porch and "pulled" herself up by the railing and "leaned over it and tried to breath." She stated: "I was trying to holler for somebody, but my voice was and my mind was kind of going." After reviving herself on the back porch, Littlefield went back inside and drank some water.

Pickard was arguing with his girlfriend because she wanted to drive home drunk. In response to the continued screaming, which woke a neighbor, C. came out of her room. Littlefield and C. heard Pickard's girlfriend "scream[] because [Pickard] punched her," so they went outside and saw Pickard's girlfriend leaning against her car "holding her face." Littlefield testified that Pickard's girlfriend "hit the side of the car after he hit her, so she was holding her face, lean[ing] against the car." Pickard then threw his girlfriend's car keys into the yard, and C. told Littlefield to go get them. Littlefield went to get the keys, and Pickard "yelled at [them] to get the

f_ck back inside." Littlefield picked up the keys, "limped and hobbled" back to the front door, and both she and C. went back inside.

C. returned to her room, and Littlefield returned to the back porch to both breath cool air, and to get away from the volatile situation in the front yard. The door from the porch to the laundry room was propped open, so Littlefield could see into the house while she was on the porch. While Littlefield was on the porch breathing in the cold air to make herself feel better, Pickard and his girlfriend, still screaming at each other, came back into the house. Pickard had gotten increasingly intoxicated, and was violent. Littlefield testified: "He was punching his girlfriend and screaming. And what just seemed like he was a little erratic at first got to the point to where he was running around and fighting and acting crazy." At some point as she was on the back porch, she was "yelling for help," but "[n]o one came out." Littlefield stated: "[A]t first I was . . . more inside [the laundry room] than outside, and I was looking around. But once they started getting louder, after I yelled, 'Help,' I stepped out more" "onto the porch because I didn't want to be seen." Pickard was using "very obscene language" and, at approximately 2:00 a.m. or 3:00 a.m. on 12 June 2013, he told his girlfriend "to go to the bedroom and wait for him." When asked if she was scared at this time, Littlefield replied: "I was terrified." Her phone was in C.'s bedroom, and Pickard was between her and that bedroom, so Littlefield remained hiding on the

porch. Littlefield was still feeling sick and disoriented at this time, and "didn't feel right."

Littlefield testified: "After [Pickard] told [his girlfriend] to go to sleep, he walked through and came [into the laundry room]. And I was leaning on the outside of the door. And he made some obscene comment about my feet." Littlefield, who was barefoot, testified that Pickard told her that her feet "were really sexy and he wanted to suck on [her] toes." This disgusted her, and she said so. Pickard then used force to rape Littlefield in the laundry room. As Pickard was assaulting her, Littlefield "screamed really loud[,]" causing Pickard to step back slightly, and Littlefield managed to kick him in his genitals. Pickard fell back against the wall, and Littlefield escaped. As Littlefield went to get her phone from C.'s bedroom, she ran by Cox's bedroom "crying very loudly" and screaming for help. However: "No one did anything[.]" Littlefield did not try knock on Cox's bedroom door for help as she "was scared to tell them or talk to them at first" because she "felt like the family would be mad at me, which I was right. They were. And they would blame me."

Littlefield ran out of Cox's house and a short distance down the street, "threw [herself] down in a bunch of rocks" in the yard of Cox's next-door neighbor, and called her "boyfriend" who lived in the area, telling him she had been raped. Her boyfriend arrived a few minutes later, on foot, along with another male friend who was staying with him at that time. Littlefield testified: "I was just crying really hysterically," "on

the ground, and I was pretty busted up. I was busted up pretty bad because I was slammed into a washer and slammed into a wall and things like that." The two boys physically lifted Littlefield off the ground, where she was "freaking out," and they carried her to the house of an adult female friend ("Molly") who lived nearby. Littlefield did not know Molly, but Molly comforted Littlefield, cleaned her up, and tended to her "bumps and bruises."

Littlefield did not want anyone to call the police or her mother because she feared that people would blame her and think she was a "whore." **R247-48, 238-39** The police were not called at that time, and Littlefield stayed at Molly's house until approximately 4:00 a.m. on 12 June 2013. **R249-50** Littlefield told them that she thought she should talk with Cox "and tell her what happened." She expected Cox "would call the cops," but she was worried that if the police were called, "it would just cause a lot of drama and people wouldn't understand." **R171** Littlefield returned to Cox's house and "hid" in C.'s room—sitting in the corner on her bed, awake and terrified. When she finally heard Pickard and his girlfriend leave the house, Littlefield went to the kitchen and waited for Cox to wake up.

Cox eventually came out of her bedroom and started making up the bed in the room where Pickard and his girlfriend had slept. Littlefield joined her, and told her what Pickard had done to her. Littlefield testified she then told Cox "that I had been given something, and that I was attacked [by Pickard]. I was [sexually assaulted],

and I was hurt. I had been hurt. I was covered in bruises. I showed her them." "I kept telling her that [Pickard] had hurt me and that . . . something was given to me . . . I couldn't stand right." "I wasn't in my right mind and that he had hurt me, and he had hit me. And details[.]" "I told her everything. I was like, 'All of these things happened.'"

Littlefield testified that Cox did not show concern or compassion for the sexual assault Littlefield has just endured, stating: "And like I expected, she didn't believe me. [S]he patronized me. Which is the reason why I didn't try to ask anyone else for help, because I knew I would be patronized." Cox told her: "People aren't going to understand.'" Littlefield said: "[Cox] told me that . . . no one would believe me and that he didn't mean it, and that is was just an accident. And patronized me, saying . . . 'people will assume things.'" Cox was "condescending" and said: "People will think bad things [of me,]" that people would "think something happened that didn't." C. was in the room with Littlefield and Cox during most of this conversation, listening to Cox's response to the fact that her brother had sexually assaulted Littlefield, but did not say anything. Littlefield said that at this time she still felt "really sick to my stomach, and my head hurt really bad. And I was still really dizzy[.]"

Following this discussion, Cox did nothing to comfort or assist Littlefield, instead acting as if nothing had happened, and attempting to ensure that Littlefield continued to stay at her house instead of returning to Wyatt's house. Littlefield did

not know if she was going to have to spend another night at Cox's house, or if Pickard would return. Wyatt testified that she called Littlefield that afternoon, and "something sounded odd about her. She said that she had a stomach ache, and . . . something didn't feel right." Wyatt testified: "[S]o I called [Cox] and said, 'I'm going to come and get [Littlefield] when I leave work this evening." However, Cox's response contained lies to keep Wyatt from taking Littlefield home: "No. Let her stay. We're going to go to the water park tomorrow. She'll be fine. They ate too much sweets, stayed up late last night watching movies. Let her stay another night." Wyatt then called Littlefield again to make sure she was okay and wanted to stay, and Littlefield responded "'[m]om, it's just a stomach ache. Let me stay.' And so I did." Littlefield testified she did not want to have her mother come get her because: "My grandmother was dying. My mom needed to be there[,]" and explained that neither of her sisters "lived close enough to do anything." Littlefield "sat around the house" and stated that they "were going to watch a movie, and that's when the police came and got me and took me home."

Apparently, one of the boys who had helped Littlefield after she had been raped told his mother about it, and she called the police. It appears someone also called the Guilford County Department of Social Services ("DSS"), saying that Littlefield had been abandoned. Further, someone other than Pickard told DSS, at some point prior to Pickard's guilty plea, that the sexual contact between Littlefield and Pickard had

been consensual. It appears that this report may have originated from Cox's house. The police—and perhaps someone from DSS—arrived at approximately 9:00 p.m. on 12 June 2013, and an officer drove Littlefield back to Wyatt's house. Littlefield refused the suggestion of the police officer that she get a "rape kit" because she was "scared." She did not want her mother or family to know that she "had been penetrated[.]" Wyatt testified that the police officer gave her a brief summary of what had happened, stating that Littlefield had been "sexually violated by [Pickard], [who] I never knew existed. In almost a year [of having known Cox], I had never heard mention of a son, period." Littlefield initially told Wyatt: "You have to believe me, Mom. Nothing happened, and I don't want to go get any test[.]" Wyatt stated that Littlefield "was scared. She didn't want to talk about it. [She said that] she hadn't done anything wrong. She didn't want me to be mad at her. That she just wanted to be . . . left alone."

Littlefield "refused to talk about it with anyone for a long time." Although she told the police that Pickard had sexually assaulted her in some manner, she did not tell them she had been raped because she was "terrified" "[o]f what people would say at school, what people would think of me, about the fact that [her boyfriend] would probably leave [her.]" When asked about the initial reaction of her sisters when she told them she was sexually assaulted, Littlefield answered: "I told you I come from a religious family. They said I asked for it." Littlefield was also worried that Wyatt

wouldn't believe that Pickard had raped her, and would assume any positive results from a rape kit were from Littlefield having had sex with her boyfriend.

According to Littlefield, Wyatt soon accepted that Littlefield had been sexually assaulted, and arranged therapy for her "when she came to understand that it wasn't my fault." However, Littlefield did not tell Wyatt that the assault had included rape "until about a year" prior to her deposition, which was in January of 2017. Littlefield had no history of any kind of mental or physical ailments prior to the events, and "had perfect grades for most of my life[.]" However, after the events, she showed immediate signs of traumatization, leading to repeated panic attacks, emotional breakdowns, self-harm, and suicide attempts. She started engaging in frequent self-mutilation, including cutting and burning herself—and she attempted suicide five times. Littlefield stated that, following the events, her grades "really slipped. I was lucky to graduate." She required counseling and medication for her diagnoses of PTSD, anxiety disorder, depression, agoraphobia, insomnia, night terrors, and ADHD triggered or exacerbated by her emotional trauma. Littlefield was taken to the emergency room a couple of times because her "mental breakdowns" were so severe. Littlefield became anorexic and bulimic following the events, "lost close to 60 pounds," "and became very, very unhealthy." She testified: "I like chopped a bunch of my hair off and stuff, and I just wanted to stay home and didn't want to go around people. And it took a huge emotional toll on me, mentally and physically."

Wyatt testified that "right after school started" C. and Cox "had been discussing it [what C. and Cox would have described as false allegations of sexual assault] at school. Subsequently, [in response to what Cox and C. had been telling people at school, Littlefield] was being attacked by other people." Littlefield testified that at school, C. "began to blame me relentlessly. Verbally, mainly just telling people awful things. Saying that I wanted to have sex with her brother and that I said something to put him in jail[.]" Other kids at Littlefield's school, in response to C.'s allegations, also started to bully her and call her names. Someone opened the same website page of an article about Pickard's arrest on every monitor in one of the classrooms. Littlefield testified that "[t]he worst of it came from [Cox] following me in school, coming to all of my things, watching me when I was doing things, coming to school almost every day to stare me down."[4]

Wyatt spoke to the detective assigned to the case, school counselors, teachers, the principal, and the school board about how Cox, C. and the rest of their family was treating Littlefield. Eventually, Cox and her family were prohibited from interacting with Littlefield directly. C. and Littlefield were also placed in different classes—though C. and her family were not prevented from attending school functions that also included Littlefield. Wyatt testified that the detective assigned to the case "had to get involved" and that "there was a gag order put on all of it" to prevent Cox and

---

[4] In Cox's deposition, Cox confirmed that she "was always present . . . in the school[,]" that she "was there at least twice a day and sometimes more."

her family from discussing the matter. Even after Cox stopped confronting Littlefield directly, because "[s]he would have gotten in legal trouble[,]" Cox would stare at her and "she would block [Littlefield's] way when [she] was walking."

Because of the harassment, and Littlefield's increasingly fragile mental state, she was often unable to attend school. Littlefield testified: "I attempted to kill myself from the stress of it all. I couldn't handle it. I was going home three or four times a week early from school, breaking down in tears[,]" so "at that point my mother pulled me out [of school], and I was on suicide watch. I wasn't allowed to have any doors [on my room]. I wasn't allowed to shower alone. Someone always ha[d] to be in the room, no sharp objects." Wyatt testified that she "had to have [Littlefield] transferred out of the school because she was harassed so badly by [Cox's] daughters." After Littlefield's transfer to another school in the district, things initially went well. However, because her new school was a rival school to her old school, word of the sexual assault soon spread to her new school and the bullying and name calling resumed. As a result of the events, Littlefield ended up transferring two more times before her graduation from high school.

Littlefield did not want to have to confront the events of that night, so she did not participate in Pickard's criminal prosecution beyond the statement she made on 12 June 2013. She was told that Pickard had signed a statement alleging that he had engaged in "consensual" sex with Littlefield, that he was charged with statutory rape,

and that he pled guilty to some lesser offense that allowed him to be released on probation for time served.[5] The fact that Pickard's conviction was based on his claim that Littlefield had "consented" to having sex with him—when in reality Pickard had raped her—caused her additional anxiety—as did Pickard's sentence, which Littlefield felt did not reflect the seriousness of what Pickard had done to her.

As noted above, Cox was also deposed in this action. Additional relevant testimony by Cox was as follows: According to Cox, Pickard and his girlfriend came to the house on 11 June 2013 before Cox had gone to bed, and Cox did not know if Pickard had been drinking before they arrived. Cox told Pickard at approximately 8:30 p.m. that she was about to go to bed, so his girlfriend would have to leave. Pickard walked his girlfriend out to her car, Cox went upstairs to bed, and that was the last time Cox saw Pickard that night. Cox believed that Pickard would stay the night, but assumed that his girlfriend would go home. Cox agreed that it would not have been unusual for Pickard to drink with his girlfriend in her car before returning to the house. Cox testified that she was a "very light sleeper," so if anyone had screamed inside the house, she would have heard it, "reacted very quickly and strongly," and "jumped out my door" to determine what was going on. Cox testified

---

[5] Pickard pleaded guilty on 17 December 2013 to one count of taking indecent liberties with a child, and charges of statutory rape and statutory sex offense were dismissed. He was given probation with a split sentence, but because he was in jail until his guilty plea, the credit he was given for time served was sufficient to cover the active portion of his split sentence, and he was released following his plea.

that she didn't hear anything unusual that night, and she woke up at approximately 4:00 a.m. on the morning of 12 June 2013, which was the normal time she awoke, because her husband's work shift started early.[6]

Cox's husband told Cox that, at approximately 4:00 a.m. the morning of 12 June 2013, while Cox was still in her bedroom, "as soon as he opened up the door from the bedroom," "[h]e saw [Littlefield] passing the door" and "then when he went to the bathroom he saw [Pickard and his girlfriend] asleep in the bed." Cox's husband told her "that it scared him because usually there aren't kids up at that hour." Cox's husband then "found a liquor bottle on the table." Because of these violations of Cox's rules, Pickard got "in big trouble" and "that was a third strike, and he was not able to stay in the house [anymore]." At approximately 4:30 a.m., Cox's husband "took care of" telling Pickard and his girlfriend to leave the house, and that Pickard was no longer welcome to live there. Because Pickard had been kicked out of the house for his conduct, Cox did not see him again for a while.

Cox was asked if, on 12 June 2013, Littlefield seemed "upset or anything like that?" Cox testified, "you know, I don't remember anything in particular."[7] Cox explained that she did not see Littlefield much on 12 June 2013 because she left for work before Littlefield woke up, and when she returned from work after 5:00 p.m.

---

[6] Because we presume the alleged facts supporting coverage to be true, we must presume Cox's testimony that she did not hear anything was not truthful.

[7] Again, we must presume Cox was not being truthful in her testimony concerning Littlefield's state of mind.

Littlefield was in C.'s room most of the time. Cox testified that Littlefield had asked her if she could spend another "couple" of nights at Cox's house, and Cox told her she would have to call Wyatt, which Littlefield did. Wyatt then called Cox to see if it was okay with her, and Cox said that would be fine.

At approximately 9:00 p.m. on 12 June 2013, after Cox had gone to bed, the police knocked on her door and asked to speak with Littlefield. Cox testified that "a lot of craziness" ensued, and that someone from "Child Protective Services" was with the police. She testified: "I know [C.] spoke with the Child Protective Service worker because [Littlefield] had told [C.] . . . that [Wyatt] had, like, physically abused her. And [C.] thought that Child Protective Services should know that[,]" "so [C.] talked to [the social worker] about that."[8] Cox said that the word "rape" was brought up at some time in the conversations with the police and the social worker. Cox said she believed the reason Littlefield was taken away was because she had been reported as abandoned. Cox testified that after Littlefield had left with the police, she came back in the house and told Cox, "'I'll get all of this straightened out, and I'll be back over tomorrow.'"

---

[8] At Pickard's plea hearing, the State, in its recitation of the factual basis for the plea, told the trial court: "[Littlefield] denied to [Wyatt] that anything had happened and seemed apprehensive about her mother . . . finding out. *At least one of the people that reported through DSS indicated that they believed that the reason for that was because it was consensual on her part and she didn't want her mom to know that, you know, that had occurred, and they referenced some – what they believed to be some tension between her and her mother[.]*" (Emphasis added).

Although Cox had testified that she didn't remember "anything in particular" about Littlefield's demeanor, and that she had hardly seen Littlefield that day, she subsequently testified that Littlefield "did tell me that she thought that [Pickard] had slipped something in her drink." When Cox asked Littlefield why Pickard would have done that, Littlefield said, "'I don't know.'" Cox testified that the following conversation ensued:

> And I said, "You know, do you feel weird? Are you okay?"
> And she goes, "No, I'm fine." I said, "I think we need to
> call" – I said, "Maybe – should we call your mom?" You
> know, "Is this – do we need to call your mom? I mean, are
> you – what's happened here?" And she said, "No." She
> goes, "I don't think it's anything. He probably didn't. It's"
> – you know. And then she just kept backtracking on it.
> And then I just let it go. She said, "Well, I'm going to take
> a shower." I said, "Okay."

Cox spoke with Pickard on the phone after he had been arrested, but he did not tell her that anything sexual had occurred between him and Littlefield. When Cox told Pickard the word "rape" had been mentioned when the police took Littlefield away, he replied: "'[Littlefield] did tell me that she was raped by an uncle.' He said, 'Maybe that's it. Maybe that's why they want to speak with me.'" Pickard eventually told Cox that he had "kissed" Littlefield, and "made out a little bit[.]" Cox was asked who she blamed for Pickard's conviction and she replied that "at that point" she "didn't know what to think[,]" but that Pickard "did not make good decisions when he was drinking." She further testified that Littlefield "acted very grown," that she

"came off as more – as an adult, you know." When asked if she felt "as though [Littlefield] tempted [Pickard] into a situation that he got caught up in," Cox replied: "I feel that, yes, he – that that's part of what happened, yes."

Littlefield's attorney asked Cox:

> [W]ouldn't you want a heads up from [] Wyatt if the situation had been reversed and [Littlefield] had a brother that was drinking like that and having those kind of problems and getting angry when drunk? Wouldn't you have wanted a, "by the way, there's a – I just want to give you a heads up, my son is here and he's got a drinking problem. So you can decide yourself if you want to put your daughter in that situation?" Wouldn't you have wanted that?

Cox agreed that she would have wanted that.

Cox further agreed that when some men get drunk they are more likely to act out sexually and do things they might not otherwise do. Cox was asked to respond to the statement "and you know that alcohol just flat out feeds that. It's a known risk, isn't it?" She answered "Yes." Cox stated that she was not fully aware of how much Pickard was drinking at that particular point in time because he had just been invited to move back into her house.

Littlefield initiated an action against Pickard and Cox in Guilford County on 13 June 2016 (the "Guilford Action"). Relevant to this appeal, Littlefield's sole claim against Cox was negligent infliction of emotional distress ("NIED"), based upon Cox's alleged failure to take reasonable actions to protect Littlefield from, and support

Littlefield after, the events leading up to her sexual assault by Pickard, the sexual assault itself, and the events following the assault. Littlefield alleged that the events resulted in "severe emotional distress," which required "hospitalization" and "extensive physical and psychological treatment[.]" Farm Bureau, pursuant to the "Homeowners Policy" ("the policy") it had issued to Cox, initially defended Cox and Pickard in the Guilford Action.[9] However, Farm Bureau initiated the present action by filing a "Complaint for Declaratory Relief" in Wake County on 10 February 2017. In its request for a declaratory judgment, Farm Bureau admitted that Littlefield had been "sexually assaulted" by Pickard in Cox's home on 11 or 12 June 2013, but argued that pursuant to the terms of the policy, including certain express exclusions from coverage, it had no "duty to defend or indemnify" Pickard or Cox in the Guilford Action. Farm Bureau therefore requested the trial court enter a judgment declaring that, pursuant to the policy, Farm Bureau had no obligations to Pickard or Cox related to the events of 11 and 12 June 2013—including no duty to defend or indemnify for any of Littlefield's claims.

Farm Bureau filed a "Motion for Summary Judgment" on 24 July 2017, arguing that, as a matter of law, it had no duty to defend or indemnify either Pickard or Cox under the policy. Farm Bureau's motion was heard 28 August 2017, and summary judgment in favor of Farm Bureau was granted by order entered 12 September 2017.

---

[9] There is no dispute that the policy was in effect when the events relevant to the present case occurred.

By its 12 September 2017 order, the trial court ruled that, pursuant to the terms of the policy, Farm Bureau had no duty to defend or indemnify Pickard or Cox in the Guilford Action. Littlefield appeals.

## II. Standard of Review

Although this is a declaratory judgment action, in "an action for declaratory judgment[] . . . decided by summary judgment, [this Court] appl[ies] the standard of review applicable to summary judgment." *N.C. Farm Bureau Mut. Ins. Co., Inc. v. Paschal*, 231 N.C. App. 558, 563, 752 S.E.2d 775, 779 (2014). "Our standard of review of an appeal from summary judgment is de novo; such judgment is appropriate only when the record shows that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *Integon Nat'l Ins. Co. v. Helping Hands Specialized Transp., Inc.*, 233 N.C. App. 652, 654, 758 S.E.2d 27, 30 (2014) (citations and quotation marks omitted). "[S]ummary judgment is an appropriate procedure for the resolution of [] declaratory judgment action[s]" involving insurance coverage *if "none of [the] factual issues are material to the issue of whether [the] policy of insurance provides coverage [for the alleged] liability."* *Id.* (citations omitted) (emphasis added).

> "On a motion for summary judgment the court may consider evidence consisting of affidavits, depositions, answers to interrogatories, admissions, documentary materials, facts which are subject to judicial notice, and any other materials which would be admissible in evidence at trial." "When considering a motion for summary

judgment, the trial judge must view the presented evidence in a light most favorable to the nonmoving party.'"

*Austin*, 224 N.C. App. at 408, 742 S.E.2d at 540–41 (citations omitted); *Waste Management of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 690, 340 S.E.2d 374, 377 (1986) ("Only those pleadings and other materials that have been considered by the trial court for purposes of summary judgment and that appear in the record on appeal are subject to appellate review.").

Although Farm Bureau argues that it has neither the duty to defend nor indemnify Cox, our review on summary judgment is limited to whether Farm Bureau has a duty to defend Cox—review of the duty to indemnify is appropriate *after* the facts have been determined at trial. *Wilkins v. American Motorists Ins. Co.*, 97 N.C. App. 266, 269, 388 S.E.2d 191, 193 (1990). The trial court in the present case ruled that Farm Bureau had no duty to defend Cox against Littlefield's NIED claim.[10]

> In determining whether an insurer has a duty to defend the underlying lawsuit, "our courts employ the so-called 'comparison test.'" That test requires us to read the pleadings in the underlying suit side-by-side with the insurance policy to determine whether the alleged injuries are covered or excluded.
>
> An insurer is excused from its duty to defend only "if the facts [alleged in the pleadings] are not even arguably covered by the policy." Any doubt as to coverage must be resolved in favor of the insured. If the "pleadings allege

---

[10] Littlefield concedes on appeal that her claims against Pickard are excluded from coverage, and therefore no duty to defend can exist with respect to these claims. The only remaining claim is Littlefield's NIED claim against Cox.

> multiple claims, some of which may be covered by the insurer and some of which may not, *the mere possibility* the insured is liable, and that the potential liability is covered, may suffice to impose a duty to defend."

*Pulte Home Corp. v. American S. Ins. Co.*, 185 N.C. App. 162, 171, 647 S.E.2d 614, 620 (2007) (citations omitted). Our Supreme Court has described the "comparison test" as requiring "reading the policies and *the complaint* 'side-by-side . . . to determine whether the events as alleged are covered or excluded.' [*Waste Management*, 315 N.C.] at 693, 340 S.E.2d at 378." *Harleysville*, 364 N.C. at 6, 692 S.E.2d at 610 (emphasis added). Although our Supreme Court used the word "complaint" in this citation from *Harleysville*, the Court clearly did not intend to limit our review to the actual third-party complaint itself—and thereby overrule *Pulte*, *Waste Management*, and plenary additional precedent.[11] In *Harleysville*, it appears "complaint" was used to mean the factual basis supporting the relevant third-party claims—*i.e.* the pleadings, depositions, answers to interrogatories, and other documents—that were properly before the trial court on summary judgment. *See Austin*, 224 N.C. App. at 408, 742 S.E.2d at 540–41. In fact, the *Harleysville* Court cited to the following language from *Waste Management*:[12]

> In order to determine whether [the alleged acts] are covered by the provisions of [the] liability insurance . . ., the policy provisions must be analyzed, then *compared with the events as alleged*. This is widely known as the

---

[11] We raise this issue because use of the above language from *Harleysville* out of context could result in application of an incorrect standard.

[12] *Harleysville*, 364 N.C. at 6, 692 S.E.2d at 610.

> "comparison test": the *pleadings* are read side-by-side with the policy to determine whether *the events as alleged* are covered or excluded. Any doubt as to coverage is to be resolved in favor of the insured.

*Waste Management*, 315 N.C. at 693, 340 S.E.2d at 378 (citations omitted) (emphasis added). Further, the Court in *Waste Management* held: "Resolution of this issue [duty to defend] involves construing the language of the coverage, its exclusions and exceptions, and determining whether *events as alleged in the pleadings and papers before the court* are covered by the policies." *Id.* at 691, 340 S.E.2d at 377; *see also Id.* at 690, 340 S.E.2d at 377 ("Only those pleadings and other materials that have been considered by the trial court for purposes of summary judgment and that appear in the record on appeal are subject to appellate review."); *Id.* at 692, 340 S.E.2d at 378 (our Supreme Court, in conducting the "comparison test," considered "three third-party complaints and a deposition" as well as the fact that "counsel for [the insurer] said in response to our question during oral argument that it had denied the allegations in the complaints"); *and Harleysville,* 364 N.C. at 6–7, 692 S.E.2d at 610-11 (citing cases in support).

In fact, our review is not always limited to the allegations presented to the trial court: "Where the insurer knows or could reasonably ascertain facts that, if proven, would be covered by its policy, the duty to defend is not dismissed because the facts alleged in a third-party complaint appear to be outside coverage, or within a policy exception to coverage." *Waste Management*, 315 N.C. at 691, 340 S.E.2d at 377

(citation omitted); *see also Kubit v. MAG Mut. Ins. Co.*, 210 N.C. App. 273, 280, 708 S.E.2d 138, 145–46 (2011) (citations omitted) ("[A]ffidavits filed by the plaintiff explaining what actually occurred during an accident—contrary to allegations in the underlying complaint—were 'relevant to the determination of defendant's duty to defend.' Since *Harleysville* did not overrule this portion of *Waste Management* . . . we remain bound by this authority."). However, our Supreme Court has clarified that the reviewing court is not to consider *hypothetical* facts in this analysis, only those facts actually alleged in the pleadings. *Harleysville*, 364 N.C. at 7, 692 S.E.2d at 611.

Therefore, we review the facts as alleged in the pleadings, depositions, and other documents properly presented to the trial court, alongside the provisions of the policy, in order to determine whether the policy requires Farm Bureau to defend Cox against Littlefield's NIED claim. Our review of the factual allegations is done in the light most favorable to Littlefield, as the non-moving party, *Austin*, 224 N.C. App. at 408, 742 S.E.2d at 540–41, and any doubts or ambiguities raised by the policy must be decided in favor of coverage—including the duty to defend. *Wilkins*, 97 N.C. App. at 272, 388 S.E.2d at 195; *see also Harleysville*, 364 N.C. at 7, 692 S.E.2d at 610 ("the facts as alleged . . . are to be taken as true and compared to the language of the insurance policy").

III. <u>Analysis</u>

As noted above, the sole question before us is whether Farm Bureau has a duty to defend Cox against Littlefield's claim for NIED. We hold that it does.

A. *General Liability Coverage*

We must first determine whether Littlefield's injury is covered by the general liability section of the policy—Section II. Pursuant to the "Conditions" provisions of Section II, the policy "applies separately to each 'insured[.]' This condition will not increase our limit of liability for any one "occurrence[.]" The general liability provision of Section II of the policy states in relevant part:

> **A. Coverage E – Personal Liability**
>
> If a claim is made or a suit is brought against an "**insured**" for damages because of "**bodily injury**" . . . caused by an "**occurrence**" to which this coverage applies, we will:
>
> . . . .
>
> 2. *Provide a defense* at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. (Emphasis added).

There is no dispute that Cox's house was an insured location under the policy, nor that both Cox and Pickard were "insured" persons. Therefore, under the policy, Farm Bureau has a general "duty to defend" if Cox's alleged acts constituted an "occurrence" that caused "bodily injury" to Littlefield. "Bodily injury" is defined in

the policy as "bodily harm, sickness or disease, including required care[.]"[13]  In Littlefield's complaint, she alleges that Cox's negligent acts caused Littlefield "to suffer severe emotional distress including hospitalization, extensive physical and psychological treatment, medical bills, pain and suffering, both physical and mental and permanent injury[.]"  We hold that Littlefield's allegations are sufficient to allege a "bodily injury" as defined by the policy.  *See, e.g., N.C. Farm Bureau Mut. Ins. Co., Inc. v. Phillips*, __ N.C. App. __, __, 805 S.E.2d 362, 366 (2017), *disc. review denied*, 370 N.C. 580, 809 S.E.2d 594 (2018).

Relevant to this appeal, the policy defines "occurrence" as "an accident . . . which results . . . in . . . 'bodily injury[.]'"  Although the policy does not define "accident," for purposes of liability coverage, our Supreme Court "has defined 'accident' as 'an unforeseen event, occurring without the will or design of the person whose mere act causes it; an unexpected, unusual, or undesigned occurrence; the effect of an unknown cause, or, the cause being known, an unprecedented consequence of it; a casualty.'"  *Waste Management*, 315 N.C. at 694, 340 S.E.2d at 379 (citation omitted).  When an insurance policy that does not define "accident" includes an exclusion for acts by an insured that were "expected or intended," our

---

[13] We note that in its brief, Farm Bureau limits its argument that no "occurrence" was properly alleged to the claims against Pickard, and does not argue that Cox's acts did not constitute an "occurrence" under the policy.

analysis does not materially change—because we must determine that an alleged "bodily injury" was "unexpected or unintended" by the insured:

> [I]n determining whether . . . alleged injuries were caused by an "occurrence," the focus should be on whether [the] damages were unexpected and unintended. In other words, we should not focus on the nature of [the insured's] alleged . . . acts of negligence in determining whether [the] alleged damages were caused by an "occurrence."

*Davis v. Dibartolo*, 176 N.C. App. 142, 148, 625 S.E.2d 877, 882 (2006); *see also id.* at 146–48, 625 S.E.2d at 881–82. "'The ultimate focus is on the *injury*, i.e., whether it was expected or intended, not upon the act and whether it was intended. Even intentional acts can trigger a duty to defend, so long as the injury was "not intentional or substantially certain to be the result of the intentional act."'" *Id.* at 148, 625 S.E.2d at 881–82 (citation omitted).

Littlefield's allegations, taken as true, would support a finding that Cox committed acts of negligence on the date in question; that Cox's negligence was a proximate cause of "bodily injury" to Littlefield; and that the injury to Littlefield was "'an unforeseen event, occurring without the will or design of'" Cox. *Waste Management*, 315 N.C. at 694, 340 S.E.2d at 379 (citation omitted). "Additionally, even if we were unable to conclusively determine whether [Littlefield's] damages were caused by an 'accident,' we are required to construe any ambiguities within an insurance policy in favor of the insured." *Davis*, 176 N.C. App. at 150, 625 S.E.2d at 883 (citations omitted). We hold that Littlefield's alleged "bodily injury" was the

result of a properly alleged "occurrence," and therefore was covered by the general liability provisions of the policy.

## B. *Exclusions*

Although we have held that, under the general liability provisions of the policy, Farm Bureau would have a duty to defend Littlefield's NIED claim, the policy also includes specific "exclusions" from coverage that Farm Bureau argues apply to Littlefield's claim. Specifically, Farm Bureau contends that the "sexual molestation" exclusion and the "expected or intended injury" exclusion each serve to defeat any duty to defend in the present case. As we discussed above in the "General Liability" section of this opinion, this Court has held that, when "accident" is not defined in an insurance policy, an "expected or intended injury" exclusion is considered in the same analysis in which we determine whether the alleged facts are sufficient to allege an "occurrence" under the policy. *See Davis*, 176 N.C. App. at 146–48, 625 S.E.2d at 881–82. In *Davis*, relying on *McCoy v. Coker*, 174 N.C. App. 311, 620 S.E.2d 691 (2005), and other precedent, this Court conducted a thorough analysis of insurance policy language in all relevant respects identical to that in the policy currently before us—including an "expected or intended" exclusion from the general liability coverage. *Davis*, 176 N.C. App. at 145–48, 625 S.E.2d at 880–82. Due to the thorough review conducted by this Court in *Davis*, we do not need to repeat that analysis here. *Id.*

As in *Davis* and *McCoy*, the relevant language in the policy provides that Farm Bureau will defend an "insured" "[i]f a claim is made or a suit is brought against an 'insured' for damages because of 'bodily injury' . . . caused by an 'occurrence' to which this coverage applies[.]" *See Davis*, 176 N.C. App. at 145, 625 S.E.2d at 880; *McCoy*, 174 N.C. App. at 314, 620 S.E.2d at 694. Just as in *Davis* and *McCoy*, the policy in the present case covers damages for "bodily injury" caused by an "occurrence," which the policy defines as "an accident." *See Davis*, 176 N.C. App. at 145-46, 625 S.E.2d at 881; *McCoy*, 174 N.C. App. at 314–15, 620 S.E.2d at 694.[14] Just as in *Davis* and *McCoy*, "accident" is not defined in the policy, so we apply its regular meaning as set forth in prior appellate opinions. *See Davis*, 176 N.C. App. at 146, 625 S.E.2d at 880; *McCoy*, 174 N.C. App. at 315, 620 S.E.2d at 694. Just as in *Davis* and *McCoy*, the policy does not contain the following italicized language within its definition of "occurrence:" "[W]hich results in bodily injury . . . *neither expected nor intended from the standpoint of the insured*[.]" *Davis*, 176 N.C. App. at 147, 625 S.E.2d at 881 (citation and quotation marks omitted) (emphasis added). However, just as in *Davis* and *McCoy*, the policy *does* include an "expected or intended" exclusion that "exclude[s] from coverage '[b]odily injury' . . . expected or intended from the standpoint of any insured." *See Davis*, 176 N.C. App. at 147, 625 S.E.2d at 881 (citation and quotation marks omitted).

---

[14] The insurance policy in *McCoy* uses the term "event" instead of "occurrence," but these terms are synonymous as defined in all three insurance policies.

This Court in *Davis*, relying on *McCoy* and other precedent, held, based upon the insurance policy as written and described above, that the "expected or intended" exclusion folded into the definition of "occurrence" such that, if the alleged facts constituted an "occurrence" as required by the language of the insurance policy, those alleged facts would necessarily *also* allege an "injury" that was neither "expected" nor "intended" by the insured. *Id.* at 147–48, 625 S.E.2d at 881–82. Therefore, having already conducted the appropriate analysis and held that Littlefield has alleged an "occurrence" pursuant to the policy, we have also necessarily held that her alleged injuries were neither "expected nor intended" by Cox. *Id.* This also means we have held that the "expected or intended" exclusion does not apply in the present case. *Id.* Having determined that the allegations in support of Littlefield's NIED claim are sufficient to demonstrate an "occurrence," and therefore render the "expected or intended" exemption inapplicable in this case, we hold Farm Bureau has a duty to defend pursuant to the terms of the *general personal liability section* of the policy. Therefore, we now limit our review to the "sexual molestation" exclusion.

Farm Bureau argues that it has no duty to defend Cox because the "sexual molestation" exclusion serves to exclude Littlefield's NIED claim from coverage and, therefore, absolve Farm Bureau of any duty to defend Cox against this claim. The sexual molestation exclusion states that the coverages set forth in the general personal liability provisions of the policy "do not apply" to any "'[b]odily injury' . . .

arising out of sexual molestation[.]" Farm Bureau contends that Littlefield's "bodily injury" arose *solely* out of Pickard's sexual assault and, therefore, Littlefield's "bodily injury" cannot be the basis of any claim requiring Farm Bureau to provide a legal defense under the policy. Because we hold that Littlefield has alleged facts that could constitute an "occurrence" that resulted in "bodily injury" to Littlefield, even if we do not consider any "bodily injury" sustained as a result of Pickard's sexual assault of Littlefield, we hold that the "sexual molestation" exclusion does not relieve Farm Bureau of its duty to defend.

Initially, we address the language "arising out of," which is not defined in the policy. Our Supreme Court has held that when, as in the present case, the term "arising out of" is not defined in the policy, it is "ambiguous" and, therefore, "is one of proximate cause[,]" and that "when an accident has more than one cause, one of which is covered by an . . . insurance policy and the other which is not, the insurer must provide coverage." *State Capital Ins. Co. v. Nationwide Mutual Ins. Co.*, 318 N.C. 534, 547, 350 S.E.2d 66, 73-74 (1986) (citations omitted). In other words, coverage will only be denied if the *sole* proximate cause of the alleged injury is the specifically excluded event or action—in the present case, "sexual molestation." *Id.* at 546-47, 350 S.E.2d at 73-74. When "arising out of" is left undefined by the policy, the analysis for whether a "bodily injury" "arises out of" an excluded cause, in a manner that also excludes the duty to defend, *does not change* depending on what the particular

excluded cause is—whether it is "sexual molestation," "use of an automobile," or any other cause—a "bodily injury" will be found to have "arisen out of" an excluded cause, such that an insurer has no duty to defend, if the excluded cause is the *sole* proximate cause of the bodily injury alleged.

Our Supreme Court has identified two controlling principles in determining whether exclusionary provisions in an insurance policy should apply:

> (1) ambiguous terms and standards of causation in exclusion provisions of homeowners policies must be strictly construed against the insurer, and (2) homeowners policies provide coverage for injuries *so long as a non-excluded cause is either the sole or concurrent cause of the injury giving rise to liability*. Stating the second principle in reverse, *the sources of liability which are excluded* from homeowners policy coverage *must be the sole cause* of the injury in order to exclude coverage under the policy.

*Id.* at 546, 350 S.E.2d at 73 (emphasis added); *see also Builders Mut. Ins. Co. v. North Main Constr., Ltd.*, 361 N.C. 85, 88–89, 637 S.E.2d 528, 530-31 (2006). Therefore, we must determine whether, taken as true and construed in favor of coverage, Littlefield's allegations could allow a determination that Cox was negligent, and that Cox's negligence was a concurrent proximate cause of Littlefield's "severe emotional distress."[15] *Johnson v. Ruark Obstetrics*, 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990) (NIED is proven when "a plaintiff has established that he or she has suffered severe emotional distress as a proximate [and foreseeable] result of the defendant's

---

[15] We presume that the sexual assault itself was one proximate cause of Littlefield's alleged "bodily injury."

negligence"). When making this determination, we must strictly construe this standard of causation against Farm Bureau and in favor of coverage. We must also strictly construe any ambiguous terms or provisions in favor of coverage. *State Capital*, 318 N.C. at 546-47, 350 S.E.2d at 73-74; *see also Maddox v. Insurance Co.*, 303 N.C. 648, 650, 280 S.E.2d 907, 908 (1981) ("[e]xclusions from and exceptions to undertakings by [an insurance company] are not favored, and are to be strictly construed to provide the coverage which would otherwise be afforded by the policy").

We hold that, even excluding the sexual assault, the allegations in support of the NIED claim were sufficient to survive summary judgment on the issue of whether Cox's negligence constituted an "occurrence" that resulted in "bodily injury" to Littlefield. This distinction is important because Farm Bureau relies heavily on this Court's opinion in *Phillips*, which held that all the claims of the insured for injuries resulting from the sexual molestation of his daughter, including negligence claims against non-perpetrator defendants for failing to prevent the sexual molestation, "ar[o]se out of the sexual molestation of his daughter and [we]re not included under the definition of a 'bodily injury' as defined under the policy." *Phillips*, __ N.C. App. at __, 805 S.E.2d at 367. Farm Bureau argues that because "Littlefield's claims against . . . Cox are all based entirely on the admitted fact that she was sexually molested by [] Pickard[,]" *Phillips* requires this Court to hold that the NIED claim against Cox *solely* alleges "bodily injury" "arising out of sexual molestation" such that

the "sexual molestation" exclusion bars recovery. In reaching its conclusion in *Phillips*, this Court did not appear to rely on the "proximate cause" standard of construction set forth in *State Capital* and its progeny—instead looking to foreign jurisdictions and applying what it termed "but for" causation. The question that arises from the reasoning in *Phillips* is whether—construing the language "arising out of" when that language is not defined in an insurance policy—we are compelled to treat the "but for" language in *Phillips* as intending to introduce a new and different standard of causation from that set forth in *State Capital*. *See State Capital*, 318 N.C. at 546-47, 350 S.E.2d at 73-74.

In the event a holding in a matter determined by this Court is in conflict with an opinion of our Supreme Court, the Supreme Court's opinion must control. *Respess v. Respess*, 232 N.C. App. 611, 625, 754 S.E.2d 691, 701 (2014). However, because of the facts in this case, we are not required to determine whether *Phillips* conflicts with *State Capital* in order to decide the case before us.

In *Phillips*, this Court held, on the facts before it:

> Defendant John Doe's claims are *entirely based upon the sexual molestation of his daughter* and would not exist "*but for*" the "molestation of a person[,]" his daughter. Whatever name, title, or label defendant John Doe seeks to assign to his claims, they arise out of the sexual molestation of his daughter and are not included under the definition of a "bodily injury" as defined under the policy.

*Phillips*, __ N.C. App. at __, 805 S.E.2d at 367 (citation omitted) (emphasis added). In light of this holding concerning the specific allegations before it, this Court's disposition in *Phillips* would have almost certainly been the same whether it applied a true "but for" analysis, or it was merely using the "but for" language to mean "proximate cause" as set forth in *State Capital*.

In the present case, even if we were to apply a straightforward "but for" analysis to the facts before us, we would still reach the same result. Events that *precede* another event cannot be considered the direct result of the later occurring event. Littlefield alleges facts *preceding* the sexual assault that could constitute a proximate cause of her "bodily injury." Taking Littlefield's allegations as true, we cannot say that Pickard's drugging and subsequent terrorization of Littlefield, *prior to* his rape of Littlefield in his family's laundry room, would not have occurred "*but for*" his rape of Littlefield. These events *had already occurred* when Littlefield was raped. Therefore, any alleged "bodily injury" that Littlefield suffered as a result of Cox's alleged negligence in failing to properly supervise Littlefield, in the time period leading up to the sexual assault, cannot constitute a "but for" result of any "sexual molestation."[16] *See Phillips*, __ N.C. App. at __, 805 S.E.2d at 367.

---

[16] We specifically address the events preceding the rape and the events following the rape separately, and hold that each set of events independently supplies sufficient allegations of an "occurrence" resulting in "bodily injury."

That Farm Bureau might conceivably argue the events leading up to the sexual assault were all part of Pickard's ultimate plan to sexually assault Littlefield does not change our analysis. We need not address the legal questions that might arise from such an argument, since the argument would be based upon factual determinations and issues of credibility that are inappropriate to consider on summary judgment review. Because these alleged facts precede the "sexual molestation" of Littlefield, the relevant analysis and holding in *Phillips* do not apply. *Phillips* could not be binding precedent for these non-"sexual molestation" allegations, even absent any conflict between *Phillips* and *State Capital.* Therefore, we can apply the standard of causation as set forth in *State Capital*—without the need to consider how *Phillips* might impact an analysis of other allegations that would not have occurred "but for" the sexual assault.

However, we also consider events *following* Pickard's rape of Littlefield in order to further support our ultimate decision in this opinion. Although we hold that the alleged events preceding the rape were sufficient to survive summary judgment on the issue of whether Cox's negligence constituted an "occurrence" that resulted in "bodily injury" to Littlefield, we recognize that were we to apply *Phillips* to the events following the rape, and read *Phillips* as requiring strict "but for" causation when applying the "comparison test," we might reach a different conclusion—but only with regard to our analysis of Cox's alleged negligence subsequent to the rape. To the

extent, if any, that *Phillips* purports to require application of a causation standard different than the "proximate cause" standard set forth in *State Capital*, we must reject that proposed standard and follow our Supreme Court's holdings in *State Capital* and its progeny.

The trial court was presented with the following allegations, which we must accept as true: Littlefield was a fifteen year-old girl brought up in a religious family with very strict rules. She had never had sexual relations, had never consumed alcohol or taken any illegal drugs, and had never spent the night outside of the care and supervision of a family member. Cox fully understood that Littlefield was a young, sheltered girl. Wyatt explained all this to Cox, and clearly explained that Wyatt would only allow Littlefield to stay overnight at Cox's house if Cox agreed that Wyatt's rules would be enforced. Cox accepted this duty freely and reassured both Wyatt and Littlefield that Wyatt's rules would be followed, and that Littlefield would be closely supervised at all times. Littlefield went to Cox's house under the reasonable assumption that Cox would follow through with her assurances, and that Cox's house would be a safe place to spend the night.

Cox not only ignored most of the rules she had specifically agreed to enforce, she also knew, at the time she had made her reassurances, that her adult son, Pickard, had recently been allowed to resume living at the house after a long "banishment." Cox knew that Pickard was an alcoholic who got belligerent and angry

when he was drinking, that he drank frequently, and that he had a tendency to do whatever he pleased—in defiance of Cox's attempts to control his behavior. Despite this knowledge, on the night of 11 June 2013, Cox left the vulnerable fifteen-year-old Littlefield unsupervised with the alcoholic and unpredictable twenty-year-old Pickard. Cox knew or should have known that Pickard would likely consume alcohol that night, and act consistently with his past behavior when under the influence.

As a direct consequence of Cox's abandonment of her duties to Littlefield, Littlefield was left alone with Pickard, and Pickard was able to drug Littlefield, which made Littlefield feel physically ill, frightened, and unable to walk. Littlefield then endured the events we have described in great detail in the "facts" section of this opinion—events which "terrified" her in general, as well as in response to specific conduct by Pickard. Cox ignored Littlefield's repeated "screamed" calls for help, even though Cox could hear Littlefield. Because Cox provided no supervision or assistance, Littlefield eventually ended up hiding on the back porch as Pickard continued to physically assault his girlfriend inside the house, in a position that blocked Littlefield's pathway to C.'s room. She then heard Pickard order his girlfriend to go to his bedroom and wait for him there, and realized that she was going to be alone and in close proximity to this drunk, violent, and out-of-control man who had drugged her. She then realized, with increasing terror, that Pickard knew where she was "hiding," and was coming toward her. Littlefield—while mentally and physically

impaired—was trapped and alone with Pickard, and she knew that none of her previous screams for help had been effective. Pickard then made "disgusting" sexual comments to Littlefield, and she therefore knew she was confronted not only with a drunk and violent man, but one who had expressed a sexual interest in her. Finally, feeling terrified, abandoned, and alone, Littlefield could do nothing as Pickard advanced toward her, grabbed her arm, and pulled her into the laundry room.

If the facts as alleged above, leading up to the sexual assault, are taken as true, a trier of fact could reasonably determine that Cox's negligence was a proximate cause of Littlefield's emotional distress even before Pickard sexually assaulted her. In other words, Cox's negligence prior to the sexual assault was a non-"sexual molestation" proximate cause of Littlefield's "bodily injury," *State Capital*, 318 N.C. at 546, 350 S.E.2d at 74, and, therefore, Pickard's "sexual molestation" of Littlefield was not the sole proximate cause of her emotional distress. *See Builders Mutual*, 361 N.C. at 89, 637 S.E.2d at 530. Because Cox's alleged negligence could be found to be a *separate* proximate cause of Littlefield's alleged "bodily injury," the sexual molestation exclusion does not absolve Farm Bureau from its duty to defend Cox.

Further, alleged facts concerning Cox's actions *subsequent to* the sexual assault also support this holding. A review of the relevant testimony, as presented above in detail, are also sufficient to support a finding that Cox's alleged failure to respond to Littlefield with any semblance of concern or care—when Littlefield informed her of

Pickard's actions, including the sexual assault—was also a proximate cause of Littlefield's injuries independent of the sexual assault itself. Cox's alleged abuse of Littlefield's trust in her, as well as Cox's alleged breach of her continuing duty to protect Littlefield, were the result of decisions Cox made subsequent to the sexual assault. She could have made different choices. The injuries that allegedly resulted from Cox's actions were not the same as the injuries that resulted from the sexual assault itself. In fact, it is not clear that Cox initially believed that any sexual contact between Pickard and Littlefield had occurred, and it is not at all clear Cox ever believed that Pickard had forcefully raped Littlefield.[17] It is Cox's dismissal of Littlefield's allegations—in whole or in part—that is at the core of events that allegedly followed and caused Littlefield additional and independent emotional distress.

Cox could have chosen to support Littlefield, and counseled C. to do the same. Instead, it is alleged that Cox "condescended" to Littlefield; told her that nobody would believe her; told her she should forget the assault and not tell anyone; insinuated that either Littlefield was to blame, or that insuring that Pickard not have to face any consequences was more important than Littlefield's well-being; and

---

[17] "Sexual molestation" is not defined in the policy. A jury could determine that, as Pickard contended, his conduct with Littlefield was "consensual" except for the age difference involved. Because "sexual molestation" is not defined, it is conceivable a jury could determine that no "sexual molestation" occurred as meant under the policy, but that Cox's actions, alone, caused Littlefield emotional distress. *I.e.*, that Cox's actions were the *sole* proximate cause of Littlefield's "bodily injury."

encouraged C.—through her actions and inaction, if not expressly—to bully Littlefield at school—thereby causing other schoolmates to follow suit. The bullying Littlefield allegedly endured at school factors significantly in her alleged emotional distress, which manifested in self-mutilation and suicide attempts. These independent actions by Cox could also be deemed sufficient by a trier of fact to show that Cox's actions following the sexual assault constituted an "occurrence" that was a proximate cause of Littlefield's emotional distress.

When we compare the alleged facts—taken as true and reviewed in the light most favorable to Littlefield—side-by-side with the sexual molestation exclusion, and the policy as a whole, we hold that the sexual molestation exclusion does not serve to absolve Farm Bureau from its duty to defend Cox from Littlefield's NIED claim. Farm Bureau's argument is predicated on its contention that no trier of fact could determine from the alleged facts that any of Littlefield's emotional distress was the result of *any conduct other than Pickard's sexual assault*. We hold that, even excluding the sexual assault, there are plenary factual allegations that could support a determination that Cox's actions and inaction, on both 11 and 12 June 2013, were a proximate cause of Littlefield's emotional distress. Further, to the extent that our application of the "comparison test" results in any doubt concerning Farm Bureau's duty to defend Cox, "[a]ny doubt as to coverage must be resolved in favor of the insured." *Pulte*, 185 N.C. App. at 171, 647 S.E.2d at 620 (citation omitted). Because

the "factual issues are material to the issue of whether [the] policy of insurance provides coverage [for the alleged] liability[,]" summary judgment was not "an appropriate procedure for the resolution of this declaratory judgment action" based upon the "sexual molestation" exclusion. *Integon*, 233 N.C. App. at 654, 758 S.E.2d at 30 (citations omitted).

## C. *Conclusion*

Having held that the general personal liability provisions of the policy include a duty for Farm Bureau to defend Cox against Littlefield's NIED claim, and that none of the exclusions in the policy apply on the facts as alleged, we reverse the trial court's grant of summary judgment in favor of Farm Bureau on this claim, and order Farm Bureau to defend Cox should Littlefield pursue her NIED claim against Cox. We affirm the grant of summary judgment in favor of Farm Bureau for the claims against Pickard, as Littlefield has abandoned any arguments related to the grant of summary judgment on these claims.

Although Littlefield makes a number of additional arguments on appeal, because we have held that Farm Bureau has a duty to defend Cox against Littlefield's NIED claim, we need not address her additional arguments beyond the following: Littlefield also appeals from the trial court's 12 September 2017 order denying her motion "to set aside the entries of default against Crystal Hamner Cox and Joseph Cain Pickard." However, in light of our holdings above, Littlefield cannot

demonstrate any prejudice that results from entry of the 12 September 2017 order, and we do not consider the merits of her argument.

AFFIRMED IN PART; REVERSED IN PART.

Judges CALABRIA and DIETZ concur in result only.

Judge Calabria concurred in result only prior to 31 December 2018.