Murphy-Brown, LLC v. Ace Am. Ins. Co., 2020 NCBC 96.

STATE OF NORTH CAROLINA
COUNTY OF WAKE

MURPHY-BROWN, LLC and
SMITHFIELD FOODS, INC.,

        Plaintiffs,

        v.

ACE AMERICAN INSURANCE
COMPANY; et al.,

        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 02793

**ORDER AND OPINION ON
PLAINTIFFS' MOTIONS FOR
PARTIAL SUMMARY JUDGMENT
AGAINST OLD REPUBLIC
INSURANCE COMPANY AND ACE
AMERICAN INSURANCE COMPANY**

THIS MATTER is before the Court on Plaintiffs' Motion for Partial Summary Judgment on Count I of their Amended Complaint Against Defendant Old Republic Insurance Company ("Partial Summary Judgment Motion against ORIC," ECF No. 289) and Plaintiffs' Motion for Partial Summary Judgment on Count II of their Amended Complaint Against ACE American Insurance Company ("Partial Summary Judgment Motion against ACE," ECF No. 293; collectively, the "Motions").

THE COURT, having considered the Motions, the briefs and evidence filed in support of and in opposition to the Motions, the evidentiary materials filed by the parties, the arguments of counsel at the hearing on the Motions, the applicable law, and other appropriate matters of record, CONCLUDES, in its discretion, that the Motions should be GRANTED for the reasons stated below.

*Middlebrooks Law, PLLC by James Middlebrooks for Plaintiffs Murphy-Brown, LLC and Smithfield Foods, Inc.*

*Reed Smith LLP by Evan T. Knott and John D. Shugrue for Plaintiffs Murphy-Brown, LLC and Smithfield Foods, Inc.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, LLP by Michael W. Mitchell for Plaintiffs Murphy-Brown, LLC and Smithfield Foods, Inc.*

*Bailey & Dixon, LLP by John T. Crook and David S. Coats for Defendants Ace American Insurance Company.*

*Clyde & Co US LLP by Marianne May and Daren McNally for Defendants Ace American Insurance Company.*

*Manning, Fulton, & Skinner, P.A. by Michael T. Medford for Defendant Old Republic Insurance Company.*

*Clausen Miller, P.C. by Amy R. Paulus and Michael Duffy for Defendant Old Republic Insurance Company.*

McGuire, Judge.

1.      In this insurance coverage action, Smithfield Foods, Inc. ("Smithfield") and its subsidiary, Murphy-Brown, LLC ("Murphy Brown"; collectively, "Plaintiffs") seek coverage from Old Republic Insurance Company ("ORIC"), Ace American Insurance Company ("ACE"; collectively for the purposes of the Motions only, "Defendants"), and other insurer-defendants for multiple underlying nuisance lawsuits initially filed against Plaintiffs in State and federal court in 2013 and 2014 (the "Underlying Lawsuits").  Presently before this Court are the Motions, by which Plaintiffs seek partial summary judgment in their favor as to the claims that ORIC and ACE breached their respective duties to defend the Underlying Lawsuits under the applicable business auto liability policies that were issued during policy periods spanning from April 30, 2010 through April 30, 2015.

## I. FACTS AND PROCEDURAL HISTORY

2.      "Although findings of fact are not necessary on a motion for summary judgment, it is helpful to the parties and the courts for the trial judge to articulate a summary of the material facts which he considers are not at issue and which justify entry of judgment." *Collier v. Collier*, 204 N.C. App. 160, 161–62, 693 S.E.2d 250, 252 (2010).

### A.      The Underlying Lawsuits

3.      Smithfield and Murphy-Brown, the third-largest pork producers in the world, grow the hogs used for their pork products on large farms in North Carolina and other states. These large farms are sometimes referred to as Concentrated Animal Feeding Operations ("CAFOs"). In 2013, Plaintiffs were named in twenty-five (25) nuisance lawsuits filed in North Carolina Superior Court, Wake County by individual plaintiffs (the "State Claimants") who live near CAFOs located in eastern North Carolina (the "State Court Lawsuits"). (Amended Complaint, ECF No. 9, at ¶¶ 29–31.)

4.      The disputes in the State Court Lawsuits were centered around Plaintiffs' operation of its CAFOs and the impact of those operations on neighboring properties. The State Claimants alleged that operations of the CAFOs subjected their neighboring properties to "recurring foul and offensive odors, particulate matter, and other substances" and to "flies and other insects" from: Plaintiffs' storage of manure, urine, and other substances in deep pits (or "lagoons"), the storage of dead animals in "dead boxes," and the practice of spraying voluminous hog manure, urine, and other

substances (referred to as "spray fields"), among other activities. (*See, e.g.*, Exs. G1–

G28, ECF No. 292.11, at pp. 1–23.) For example, the State Court Lawsuits[1] alleged:

> [R]ecurring foul and offensive odors, hog manure and urine, particulate matter, other substances, flies and/or other insects, and in some cases, buzzards and/or scavenger animals . . . have emanated from such operations and invaded [the State Claimants'] properties, thereby substantially impairing [the State Claimants'] land, property rights, and use and enjoyment of their property, and causing harm including but not limited to: substantial anger, embarrassment, discomfort, annoyance, inconvenience, decreased quality of life, deprivation of [the State Claimants'] opportunity to continue to develop their respective properties, injury to [the State Claimants'] properties, and in the case of some [State Claimants], health concerns and/or material physical and/or mental discomfort, and [the State Claimants] have thereby been damaged.

(*Id.* at p. 14.) Based on these allegations, the State Claimants brought claims for

private nuisance, negligence, and negligent entrustment,[2] seeking both actual and

punitive damages. (*Id.* at pp. 14–23.)

5. The State Claimants dismissed the State Court Lawsuits in 2014. (ECF

No. 9, at ¶ 32.) However, prior to dismissing the State Court Lawsuits, most of the

same plaintiffs[3] filed the Underlying Lawsuits against Smithfield and Murphy-

---

[1] Referring to the *Alderman* complaint (ECF No. 292.11, at pp. 1–23), which contains allegations typical and substantially identical to the allegations in the other State Court Lawsuits.

[2] Referring to Smithfield's entrustment of its hogs to certain individuals or entities which raise hogs on behalf of Smithfield through contract-grow agreements. (ECF No. 292.11, at p. 21.)

[3] There were 26 lawsuits filed in federal court against Smithfield and Murphy-Brown. Some of the State Claimants did not file lawsuits in federal court, but some additional plaintiffs who had not filed State Court Lawsuits filed Federal Court Lawsuits.

Brown. (*Id*. at ¶¶ 32–34.) The plaintiffs in the Federal Court Lawsuits (referred to as the "Federal Claimants"; collectively with the State Claimants as the "Claimants") brought claims based on allegations substantially similar to those pled in the State Court Lawsuits. (*Id*. at ¶ 35; Aff. of Parul Stevens, ECF No. 291, at ¶¶ 11, 13.) Based on these allegations, the Federal Claimants each brought single claims of private nuisance, seeking both actual and punitive damages. (*Id*. at pp. 256–58, ¶¶ 156–75.)

6.      Relevant to this dispute, the complaints in the Underlying Lawsuits also contain allegations that Plaintiffs' use of large trucks in operating the CAFOs cause a nuisance. Specifically, the complaints in the State Court Lawsuits allege:

> [Murphy-Brown's] CAFOs are also a major source of truck traffic that create or contribute to additional recurrent excessive noise, odors, and in some cases emanate manure, urine, and other substances onto the roads.

(ECF No. 292.11, at p. 15, ¶ 72.)

7.      The complaints in the Federal Court Lawsuits allege:

> [A]s another independent cause of the nuisance, [Murphy-Brown's] hogs necessitate very large trucks crawling up and down the streets outside of the [Claimants'] homes. These are often narrow and even unpaved country lanes, which normally would never be subjected to having repeated episodes of large tractor-trailers and other big trucks taking feed to the hogs, trucking in live hogs, and trucking out both live hogs and dead hogs. These trucks often go by [Claimants'] homes in the dead of night and they cause noise, dust, liquid spilling from the trucks and bright lights of their headlights.

(ECF No. 292.15, at p. 217, ¶4.)

> Large hog trucks carry hogs into and out of the facilities. All of these activities cause odor, annoyance, dust, noise and loss of use and enjoyment of homesteads. The stench

and associated nuisance also embarrasses and humiliates the [Claimants].

(*Id.* at pp. 221–22, ¶ 33.)

> [Claimants] have suffered . . . liquid dripping from passing hog trucks and 'dead trucks,' the increased pest populations and other aspects of the nuisance. The [Claimants] feel angry, fearful, worried, and depressed. They are worried and fearful about their health and their children's health.

(*Id.* at pp. 222–23, ¶ 36.)

> Big trucks go past [Claimants'] house with live and dead hogs. These trucks can produce a stench and also they cause noise and dust. The foul odor has affected [Claimants'] use and enjoyment of their land and their ability to enjoy time with family and friends.

(*Id.* at p. 237, ¶ 127.)

> [E]ver since the hogs have come, very large trucks crawl up and down the streets outside of the [Claimants'] homes . . . . These trucks cause noise, dust, and lights from headlights and they pass even in the middle of the night.

(*Id.* at p. 244, ¶ 180.)

8.    Further, the Underlying Lawsuits contain allegations that Plaintiffs knew or had reason to know of the nuisance caused by their CAFOs, as well as allegations of negligence and reckless disregard. For example, the complaints in the Federal Court Lawsuits allege:

> [Murphy-Brown] had actual knowledge during some or all pertinent times that the subject hogs were causing a nuisance.

(*Id.* at p. 257, ¶ 164.)

> In contrast to [Murphy-Brown's] assertions that its hogs do not cause nuisance or injury, numerous scientific reports and studies have found that they do. These reports show that [Murphy-Brown] has actual knowledge of the nuisance caused by its swine, or is willfully blind to that fact.

(*Id.* at p. 253, ¶ 214.)

> Studies, reports, incidents and complaints that have amassed since [Murphy-Brown] first started the CAFO system clearly show predictable nuisance caused by swine sites to nearby neighbors.

(*Id.* at p. 251, ¶ 205.)

> [Murphy-Brown] knew or should have known that [Murphy-Brown's CAFOs] would recurrently encroach upon and invade [Claimants'] properties, and substantially impair [Claimants'] use and enjoyment of their properties.

(*Id.* at p. 257, ¶ 165.)

> The recurring conduct, acts, omissions, negligence, and impropriety of [Murphy-Brown] were willful, wanton, malicious, and in reckless disregard for the rights and interests of the [Claimants] and justify an award of punitive damages.

(*Id.* at p. 258, ¶ 175.)

9.     Jury trials in five of the Federal Court Lawsuits have been completed, resulting in judgments against Plaintiffs of roughly $98 million. (ECF No. 9, at ¶¶ 42–48.) The Fourth Circuit has since reviewed one of these judgments, remanding the case for the sole purpose of re-determining the proper amount of punitive damages. *McKiver v. Murphy-Brown, LLC*, 2020 U.S. App. LEXIS 36416, at *84 (4th Cir. 2020).

## B. The Insurance Policies

10. During the policy periods spanning from April 30, 2010 through April 30, 2015, Plaintiffs were insured under commercial general liability insurance policies (the "Primary CGL Policies") and business automobile policies (the "Primary Auto Policies") issued by ACE or ORIC. Specifically, ACE issued one CGL Policy and one Primary Auto Policy for the coverage period from April 30, 2010 through April 30, 2011. (Aff. of Marianne May, ECF No. 330, at ¶ 3; ECF No. 291, at ¶ 4; ECF No. 292.1.) ORIC issued four (4) successive Primary CGL Policies and (4) successive Primary Auto Policies for the coverage periods from April 30, 2011 through April 30, 2015. (Aff. of Michael Duffy, ECF No. 358, at ¶¶ 3–4; ECF No. 291, at ¶¶ 5–8; ECF Nos. 292.2–9.)

11. In their Motions, Plaintiffs seek summary judgment only on their claims that Defendants breached their respective duties to defend the Underlying Lawsuits under the Primary Auto Policies, but not under the Primary CGL Policies. The ACE and ORIC Primary Auto Policies contain identical or nearly identical terms.[4] The Primary Auto Policies contain the following grants of coverage:

> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

(ECF No. 292.8, at p. 57 (hereinafter, the "First Coverage Grant").)

---

[4] Given the identical relevant language of the Primary Auto Policies, the Court will refer to the provisions of the 2014–2015 Business Auto policy issued by ORIC, except as otherwise noted, for quotation of policy provisions. (Ex. E, ECF No. 292.8–9.)

We will also pay all sums an "insured" legally must pay as a "covered pollution cost or expense" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of covered "autos". However, we will only pay for the "covered pollution cost or expense" if there is either "bodily injury" or "property damage" to which this insurance applies that is caused by the same "accident".

(*Id.* at p. 57 (hereinafter, the "Second Coverage Grant").)

We have the right and duty to defend any "insured" against a "suit" asking for such damages or a "covered pollution cost or expense". However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" or a "covered pollution cost or expense" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

(*Id.* at p. 57.)

12. In the Primary Auto Policies, "bodily injury" is defined as "physical injury, mental anguish, mental injury, shock, humiliation, sickness or disease sustained by a natural person . . . ." (*Id.* at p. 94.) "Property damage" is defined as "damage to or loss of use of tangible property." (*Id.* at p. 66.) The policies do not contain a definition of "accident," but provide that an "accident" "includes continuous or repeated exposure to the same conditions resulting in 'bodily injury' or 'property damage.'" (*Id.* at p. 64.) Covered "auto" is defined as "any auto" including "land motor vehicle, 'trailer' or semitrailer designed for travel on public roads." (*Id.*)

13.     Under the Primary Auto Policies, a "covered pollution cost or expense," as provided for in the Second Coverage Grant, is limited to costs or expenses arising from:

> 1. Any request, demand, order or statutory or regulatory requirement that any "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or
>
> 2. Any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of "pollutants".

(*Id*. at p. 65.) "Pollutants" are defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (*Id*. at p. 66.)

14.     The Primary Auto Policies exclude coverage for expected or intended injury (the "Expected or Intended Injury Exclusion"), and pollution (the "Pollution Exclusion"). (*Id*. at pp. 58–60.) "Expected or Intended Injury" is defined as "'bodily injury' or 'property damage' expected or intended from the standpoint of the 'insured.'" (*Id*. at p. 58.)

15.     The Pollution Exclusion excludes coverage for:

> "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":
>
> a. That are, or that are contained in any property that is:
>   (1) Being transported or towed by, handled, or handled for movement into, onto or from, the covered "auto";

> (2) Otherwise in the course of transit by or on behalf of the "insured"; or
>
> (3) Being stored, disposed of, treated, or processed in or upon the covered "auto"
>
> b. Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto";
>
> c. After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured."

(*Id.* at pp. 59–60.) Further, an endorsement titled "Pollution Liability – Broadened Coverage For Covered Autos" states: "Paragraph a. of the Pollution Exclusion applies only to liability assumed under a contract or agreement." ("Pollution Endorsement," *Id.* at p. 169.)[5]

16. The Primary Auto Policies impose a duty on the insured to provide "prompt notice of the 'accident' or 'loss.'" (*Id.* at p. 62.) A failure to fully comply with the notice requirements set out in the Primary Auto Policies relieves the insurers' duty to provide coverage. (*Id.*) A "Notice of an Accident" endorsement under ORIC's Primary Auto Policies clarifies that "if you report an occurrence to an insurer providing other than Automobile Liability insurance, which later develops into an Automobile Liability claim covered under this policy, failure to report such occurrence to us at the time of the occurrence shall not be deemed a violation of these conditions." ("Notice of an Accident Endorsement," *Id.* at p. 120.) ACE's Primary Auto Policy also

---

[5] The Court will refer to the Second Coverage Grant, the Pollution Exclusion, and the Pollution Endorsement collectively as the "Pollution-Related Provisions."

includes a Notice of Accident Endorsement, which is identical to ORIC's aside from the following additional language "[the insured] shall give immediate notification of the accident to [ACE], as soon as is reasonably possible, that the accident is an Automobile Liability claim." (ECF No. 292.1, at p. 59.)

17. The Primary Auto Policies have policy limits of $2 million, with the exception of one (1) ORIC Primary Auto Policy which has a $3 million policy limit. (ECF 292.1, at p. 2; ECF Nos. 292.2, 292.4, 292.6, 292.8.) Further, the Primary Auto Policies are subject to a $1 million "deductible"[6] that is eroded by Plaintiffs' payment of defense costs. (ECF No. 292.1, at pp. 52–53; ECF No. 292.8, at p. 44.)

18. At all pertinent times to this dispute, Plaintiffs' used Marsh USA, Inc. ("Marsh") as their insurance broker. (ECF No. 290, at p. 11; ECF No. 294, at p. 10; ECF No. 291, at ¶¶ 19, 32.)

**C.     The Program Agreement Between ORIC and Plaintiffs**

19. ORIC and Smithfield entered into a Program Agreement which governed certain aspects of their insurance relationship ("Program Agreement"). (ECF No. 363.1 [SEALED], public redacted version at ECF No. 369.1[7]; ECF No. 358, at ¶ 2, Ex. 1.)[8] ORIC issued its Primary CGL Policies and Primary Auto Policies pursuant to the Program Agreement under which Plaintiffs agreed to "retain all or a

---

[6] A "deductible" is the "portion of the loss to be borne by the insured before the insurer becomes liable for payment." *Deductible*, BLACK'S LAW DICTIONARY (11 ed. 2019).

[7] For future reference, after any initial specific citation to documents sealed by this Court, the Court will thereafter only cite to the ECF number of the public, redacted version.

[8] ACE was not a party to the Program Agreement.

certain portion of the Losses and Allocated Loss Adjustment Expenses" incurred under those policies. (ECF No. 369.1, at p. 1.) The Program Agreement provides, in relevant part:

> Claims arising under Policies issued by Old Republic will be administered by a third party claims administrator approved by, and under a contract acceptable to Old Republic or, when approved by Old Republic, self administered by the Insured under an acceptable separate written contract. Claims arising solely under [the Primary CGL Policies] issued by Old Republic shall be defended by legal counsel selected by the Insured. Whether a third party claims administrator or the Insured itself, the party administering the claim must: provide a monthly report to Old Republic showing the status of all claims, including details of payments and outstanding reserves in a format acceptable to Old Republic . . . .

(ECF No. 369.1, at § 10.1.)

20.  Pursuant to the Program Agreement, ORIC's Primary CGL Policies are subject to a retention[9] equivalent to "100% of the Policy limits" (*Id.* at Schedule A), and generally act as "fronting policies" because the retention amount for each occurrence is equal to the policy limits.[10] Smithfield is responsible for paying "all loss and [Allocated Loss Adjustment Expense ["ALAE"]]." (*Id.*) "ALAE" is defined as

---

[9] "Retention" refers to a "Self-Insured Retention," which is "[t]he amount of an otherwise-covered loss that is not covered by an insurance policy and that usu[ally] must be paid before the insurer will pay benefits[.]" *Self-insured retention*, BLACK'S LAW DICTIONARY (11 ed. 2019).

[10] A "fronting policy" is, in a practical sense, a form of self-insurance. The deductible equals the policy's liability limits, and the insurance company acts only as a surety that the holder of the fronting policy will be able to pay any judgment covered by the policy. Essentially, the insured rents an insurance company's licensing and filing capabilities, and in return, the insurer issues a policy which allows the corporation to comply with the insurance laws and regulations of each state. *See Croft v. Old Republic Ins. Co.*, 618 S.E.2d 909, 915–17 (S.C. 2005).

"expenses which are incurred in conjunction with the investigation, defense, adjustment or settlement of claims or suits" which includes, but is not limited to, legal costs and attorneys' fees. (*Id*. at § 4(a).)

21. Pursuant to the Program Agreement, ORIC's Primary Auto Policies are subject to a $1 million per accident retention, where Plaintiffs are responsible for paying "all [ALAE] up to, but not exceeding, the Insured's Retention." (*Id*. at Schedule A (hereinafter, the "Retention Requirements").)

22. The Program Agreement also provides as follows:

> To the extent that any of the terms or conditions of the aforesaid Policies are inconsistent with any of the terms or conditions of this Agreement, the latter are to be given effect and the former will be considered superseded by this Agreement.

(*Id*. at § 20.)

23. ACE's Primary CGL Policy and Primary Auto Policy issued to Plaintiffs are *not* subject to the Program Agreement.

**D.    Communication between the Insurers and the Insured**

24. Plaintiffs first notified ORIC and ACE of the State Court Lawsuits through "First Report of Loss" letters sent by Marsh at the direction of Plaintiffs on July 19, 2013. (Exs. P1–P14, ECF No. 292.25, at pp. 2–6; Exs. L1–L14, ECF No. 292.23, at pp. 2–6; collectively, "First Reports of Loss.") The First Reports of Loss, along with at least four additional notice letters sent to ORIC and ACE in October 2013, were reported under the Primary CGL Policies, but included language stating: "[t]his matter is reported under any and all applicable policies whether or not cited."

(ECF No. 292.25, at pp. 2–66; ECF No. 292.23, at pp. 2–67.) On November 7, 2013, Plaintiffs first reported the loss to ORIC and ACE specifically under "business auto" coverage in addition to CGL coverage. (ECF No. 292.25, at pp. 67–69; ECF No. 292.23, at pp. 68–70.) Plaintiffs provided two additional notice letters reported under the Primary Auto Policies to both ORIC and ACE in October and November 2014, notifying them of the newly filed Federal Court Lawsuits. (ECF No. 292.25, at pp. 70–78; ECF No. 292.23, at pp. 71–79.) All notice letters previously referenced, as well as reports of loss, included copies of the complaints in the Underlying Lawsuits.

### i. Responses from ORIC

25. ORIC first responded to Plaintiffs' notice regarding the State Court Lawsuits on September 20, 2013. (Ex. Q, ECF No. 292.19.) ORIC's first response reads, in pertinent part: "[w]e have reviewed the allegations in the complaint and a defense is owed in this matter pursuant to a full reservation of rights[.]" (*Id*.)

26. In 2015, ORIC twice requested status updates of the Underlying Lawsuits through Plaintiffs' insurance broker, Marsh. (Ex. 12, ECF No. 363.12; Ex. 13, ECF No. 363.13.) The only updates provided were that McGuire Woods, LLP was handling the defense in the Underlying Lawsuits, and that they planned on putting together a status update for the carriers. (*Id*.)

27. On April 21, 2016, ORIC issued essentially identical coverage letters regarding the State Court Lawsuits and Federal Court Lawsuits, titled: "Renewed Denial of Coverage / Reservation of Rights." (Ex. R, ECF No. 292.20; Ex. S, ECF No. 292.26; collectively "April 2016 Coverage Letters.") The April 2016 Coverage Letters

generally state that their purpose is "to supplement [ORIC's] previous correspondence with [Plaintiffs], re-assert previous Denial of Coverage / Reservation of Rights and to remind [Plaintiffs] of [ORIC's] ongoing coverage position." (ECF No. 292.20, at p. 1; ECF No. 292.26, at p. 1.) Throughout the letters, ORIC repeatedly "denies coverage" while also "reserv[ing] the right to disclaim indemnity." (*See* ECF No. 292.20, at pp. 3–4, 11, 13, 15–16, 21, 23; ECF No. 292.26, at pp. 2, 8, 10, 11–12, 13, 16, 18.)

28. The April 2016 Coverage Letters provide an analysis of ORIC's coverage position, in which ORIC acknowledges that: "the Underlying Complaints, when read as a whole, do allege that the operation of the CAFOs (which include the alleged increase in truck traffic) generally have caused [bodily injury]"; "[t]he [allegations in the Underlying Lawsuits] appear to fit in [the policy's] definition of 'property damage'"; "a fair reading of the Underlying Complaints do not appear to allege that the damage was caused by an intentional incident or incidents, but rather appear to be progressive, ongoing accidental damage"; "the Complaints [to the Underlying Lawsuits] do make an allegation that they sustained damages resulting from the operation of an automobile"; and "there is a nexus between the alleged injuries and alleged use of a vehicle." (ECF No. 292.20, at p. 10, 19–20; ECF No. 292.26, at p. 7, 15–16.) Despite these acknowledgments, ORIC "denie[d] coverage under the Auto Policy and further reserve[d] the right to disclaim indemnity[.]" (ECF No. 292.20, at p. 21; ECF No. 292.26, at p. 16.)

29. With respect to the Pollution Exclusion in ORIC's Primary Auto Policies, ORIC acknowledged that it is "questionable and unlikely" that the Pollution Exclusion excludes coverage for damage caused by "noise," as is alleged in the Underlying Lawsuits. Further, ORIC acknowledged that the Pollution Endorsement to the ORIC's Primary Auto Policies

> essentially eliminates the Pollution exclusion, except in circumstances: (1) where liability [is] assumed in a contract . . . ; (2) where the accident occurs before the pollutants are removed from the place where they are accepted . . . ; or (3) after the pollutants are removed from the covered auto to the place where they are finally delivered, disposed of or abandoned by the insured.

(ECF No. 292.20, at pp. 22–23; ECF No. 292.26, at p. 17.) Nevertheless, ORIC found that the Pollution Exclusion "eliminates coverage" and, therefore, ORIC again "denie[d] coverage . . . and further reserve[d] its right to disclaim indemnity[.]" (ECF No. 292.20, at p. 23; ECF No. 292.26, at p. 17–18.)

30. With respect to ORIC's Expected or Intended Injury Exclusion, the April 2016 Coverage Letters state: "Old Republic denies coverage and further reserves the right to disclaim indemnity . . . to the extent that [Plaintiffs] had knowledge that generally, the alleged directed practices of CAFO could and did cause injury to someone, and/or to [Claimants] in particular." (ECF No. 292.20, at p. 23; ECF No. 292.26, at 18.)

### ii. *Responses from ACE*

31. ACE first responded to Plaintiffs' notice of the State Court Lawsuits by an email dated July 22, 2013. (Ex. M-1, ECF No. 292.16.) In the email, ACE stated

it was "in the process of establishing a claim file and reviewing the information" and that "[i]n the meantime, ACE reserves its rights and defenses[.]" (*Id.*)

32. ACE did not provide its next response until it sent coverage position letters to Plaintiffs dated May 4, 2018 and May 17, 2018. (Ex. N, ECF No. 292.18; Ex. O, ECF No. 292.24 (hereinafter, "ACE Coverage Letters").) In these letters, ACE "reserve[d] all of its rights to deny coverage" on grounds that the claims: "do not appear to involve 'bodily injury' or 'property damage' caused by an 'accident' resulting from the ownership, maintenance or use of a covered 'auto' during the policy period"; "may be excluded by the pollution exclusion"; and may "fall within the scope of the expected or intended injury exclusion." (ECF No. 292.24, at p. 8.) Further, the ACE Coverage Letters "reserve[] all [ACE's] rights to deny coverage on the grounds that the notice and/or cooperation conditions have not been met." (*Id.*)

E. **Initiation of the present lawsuit**

33. To date, neither ORIC nor ACE have provided a defense to Plaintiffs in the State Court Lawsuits or the Federal Court Lawsuits. (ECF No. 291, at ¶¶ 30, 43.) Since in or around 2013, counsel retained by Plaintiffs, McGuire Woods LLP, has handled Plaintiffs' defense in the Underlying Lawsuits. (ECF No. 363.23.)

34. On February 28, 2018, Plaintiffs, in a letter to Marsh, provided a litigation status report regarding the Underlying Lawsuits, which contained the following statement: "To date, Smithfield/Murphy Brown have paid [REDACTED] to defend the nuisance lawsuits in North Carolina. Smithfield/Murphy-Brown repeat their prior request that their insurers defend and indemnity them under applicable

general and auto liability policies." (ECF No. 363.15 [SEALED], public redacted version at ECF No. 369.15.)

35. On March 5, 2019, Plaintiffs commenced this action by filing the Complaint (ECF No. 4). Plaintiffs filed an Amended Complaint on March 19, 2019 (ECF No. 9). Count I of the Amended Complaint alleges a breach of ACE's duty to defend Plaintiffs in the Underlying Lawsuits under ACE's Primary Auto Policy and Count II alleges the same claim against ORIC under ORIC's Primary Auto Policies. (*Id*. at ¶¶ 74–89.) Plaintiffs filed their Partial Summary Judgment Motion against ORIC (ECF No. 289) and their Partial Summary Judgment Motion against ACE (ECF No. 293) on March 20, 2020. Defendants ORIC and ACE responded in opposition to the Motions on June 12, 2020 and June 1, 2020, respectively. (ORIC's Opp. To Plf.'s Mot. Part. Summ. J. on Ct. II of Amend. Compl., ECF No. 357 [SEALED], public redacted version at ECF No. 368; ACE's Mem. Of Law in Opp. To Plf.'s Mot. Part. Summ. J. on Ct. 1 of Amend. Compl., ECF No. 329.) Plaintiffs replied to the Briefs in Opposition on July 6, 2020 and June 25, 2020, respectively. (Plf.'s Repl. Bf. Supp. Plfs.' Mot. Part. Summ. J. Against Def. ORIC on Ct. II of Amend. Compl., ECF No. 379; Plfs.' Repl. Bf. Supp. Plfs.' Mot. Part. Summ. J. on Ct. of Amend. Compl., ECF No. 374.) A hearing on the Motions was held on September 9 and September 21, 2020. The Motions are now ripe for decision.

## II. LEGAL STANDARD

### A. Summary Judgment

36. Summary judgement is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs.*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (quoting N.C.G.S. § 1A-1, Rule 56(c)). "An issue is 'genuine' if it can be proven by substantial evidence and a fact is 'material' if it would constitute or irrevocably establish any material element of a claim or a defense." *CSX Transp., Inc. v. City of Fayetteville*, 247 N.C. App. 517, 521, 785 S.E.2d 760, 763 (2016) (quoting *Lowe v. Bradford*, 305 N.C. 366, 369, 289 S.E.2d 363, 366 (1982)). The Court views the evidence in the "light most favorable to the non-moving party." *Allstate Ins. Co. v. Lahoud*, 167 N.C. App. 205, 207, 605 S.E.2d 180, 182 (2004) (citation omitted).

37. "The party moving for summary judgment ultimately has the burden of establishing the lack of any issue of triable fact." *Unitrin Auto & Home Ins. Co. v. McNeill*, 215 N.C. App. 465, 467, 716 S.E.2d 48, 50 (2011) (citations omitted). The moving party may meet this burden by "proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000) (citations omitted). Once the moving party "makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific

facts, as opposed to allegations, showing that he can at least establish a prima facie case at trial." *Unitrin Auto & Home Ins. Co.*, 215 N.C. App. at 467, 716 S.E.2d at 50 (citations omitted).

## B. Duty to Defend

### i. Generally

38. Insurance contracts commonly impose upon on the insurer two related duties: the duty to defend and the duty to indemnify. A "duty to defend" refers to the "insurer's obligation to defend its insured against claims brought by third parties." 1 LEXIS NEXIS PRACTICE GUIDE: NEW APPLEMAN NORTH CAROLINA INSURANCE LITIGATION § 15.02 (2020). The "duty to indemnify is the duty to pay for settlement or to pay a judgment rendered against an insured." *Id.* at § 4.04. Our Supreme Court has addressed the difference between these two duties:

> Generally speaking, the insurer's duty to defend the insured is broader than its obligation to pay damages incurred by events covered by a particular policy. An insurer's duty to defend is ordinarily measured by the facts as alleged in the pleadings; its duty to pay is measured by the facts ultimately determined at trial. When the pleadings state facts demonstrating that the alleged injury is covered by the policy, then the insurer has a duty to defend, whether or not the insured is ultimately liable.

*Waste Management of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 691, 340 S.E.2d 374, 377 (1986). In other words, "the duty to defend is broader than the duty to indemnify in the sense that an unsubstantiated allegation requires an insurer to defend against it so long as the allegation is of a covered injury[.]" *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C.*, 364 N.C. 1, 7, 692 S.E.2d 605, 610–11 (2010).

However, the duty to defend is not without limitation: "even a meritorious allegation cannot obligate an insurer to defend if the alleged injury is not within, or is excluded from, the coverage provided by the insurance policy." *Id.*

39.     "[T]here is no statutory requirement that an insurance company provide its insured with a defense." *Brown v. Lumbermens Mut. Casualty Co.*, 326 N.C. 387, 392, 390 S.E.2d 150, 153 (1990). "An insurer's duty to defend suits against its insured is determined by the language in the insurance contract." *Id.* Thus, a duty to defend exists where "a[n] [insurance] company [ ] provide[s] by contract that it will defend its insured." *Id.* Accordingly, general contract interpretation rules apply to the Court's duty to defend analysis. *See Accardi v. Hartford Underwriters Ins. Co.*, 373 N.C. 292, 295, 838 S.E.2d 454, 456 (2020) ("When interpreting an insurance policy, courts apply general contract interpretation rules.") "[A] contract of insurance should be given that construction which a reasonable person in the position of the insured would have understood it to mean[.]" *Grant v. Emmco Ins. Co.*, 295 N.C. 39, 43, 243 S.E.2d 894, 897 (1978). Provisions in a policy "[w]hich extend coverage . . . must be construed liberally so as to afford coverage whenever possible by reasonable construction." *N.C. Farm Bureau Mut. Ins. Co. v. Stox*, 330 N.C. 697, 702, 412 S.E.2d 318, 321 (1992). Provisions which exclude or put limitations or conditions on coverage are "construed strictly . . . to provide coverage." *Trust Co. v. Insurance Co.*, 276 N.C. 348, 355, 172 S.E.2d 518, 522–23 (1970). "Any doubt as to coverage is to be resolved in the favor of the insured." *Waste Mgmt.*, 315 N.C. at 693, 823 S.E.2d at 378; *see*

*Jamestown Mut. Ins. Co. v. Nationwide Mut. Ins. Co.*, 266 N.C. 430, 434, 146 S.E.2d 410, 414 (1966) (construing an ambiguous policy provision in the favor of the insured).

40. A duty to defend is triggered when an insurer receives actual notice of an underlying complaint that contains "potentially" or "arguably" covered claims under the insurance contract. *See Crandell v. Am. Home Assur. Co.*, 183 N.C. App. 437, 438, 644 S.E.2d 604, 605 (2007) (finding an insurer has a duty to defend where a "review of the pleadings . . . gives rise even to 'a mere possibility' that the insured's potential liability is covered by the insurance policy"); *Waste Mgmt.*, 315 N.C. at 692, 340 S.E.2d at 378 (finding that an insurer is only excused from its duty to defend where "the facts are not even arguably covered by the policy"); *Kubit v. MAG Mut. Ins. Co.*, 210 N.C. App. 273, 293, 708 S.E.2d 138, 154 (2011) ("[T]he duty to defend arises when an insurer receives actual notice of the underlying action."). The presence of both non-covered and potentially or arguably covered claims in an underlying complaint does not relieve an insurer of its duty to defend. *See Pulte Home Corp. v. Am. S. Ins. Co.,* 185 N.C. App. 162, 171, 647 S.E.2d 614, 620 (2007) (finding that where the pleadings allege both non-covered and potentially covered claims, "the mere possibility the insured is liable, and that the potential liability is covered, may suffice to impose a duty to defend" (internal quotations omitted) (citation omitted)); *Builders Mut. Ins. Co. v. Mitchell*, 210 N.C. App. 657, 667, 709 S.E.2d 528, 535 (2011) ("Where . . . there are multiple claims, if some of the claims may be covered, even if others are not, the duty to defend is triggered.").

*ii.* *Comparison Test*

41. In determining whether claims are potentially or arguably covered under an insurance policy, North Carolina courts routinely apply the "comparison test": the language of the insurance policy and underlying complaint are read "side-by-side . . . to determine whether the events as alleged are covered or excluded." *Waste Mgmt.*, 315 N.C. at 693, 340 S.E.2d at 378; *see Harleysville*, 364 N.C. at 6, 692 S.E.2d at 610; *N.C. Farm Bureau Mut. Ins. Co. v. Cox,* 263 N.C. App. 424, 441, 823 S.E.2d 613, 625 (2019); *Duke Univ. v. St. Paul Fire & Marine Ins. Co.*, 96 N.C. App. 635, 637, 386 S.E.2d 762, 763–64 (1990). All the facts alleged in the underlying complaint are taken as true, and "[i]f the insurance policy provides coverage for the facts as alleged, then the insurer has a duty to defend."[11] *Harleysville*, 364 N.C. at 7, 692 S.E.2d at 611. Accordingly, a duty to defend may be found even where the facts upon which the duty is based "may not, in reality, be true." *Id.*

42. The Court is generally limited to the pleadings in applying the comparison test. *See Waste Mgmt.*, 315 N.C. at 691, 340 S.E.2d at 377 ("An insurer's duty is ordinarily measured by the facts as alleged in the pleadings[.]"). However, North Carolina courts as well as relevant federal courts have recognized that facts outside the pleadings may only be considered to provide for, rather than to deny, coverage. *See Duke Univ.*, 96 N.C. App. at 638, 386 S.E.2d at 764 (citations omitted) (stating that "facts learned from the insured and facts discoverable by reasonable

---

[11] Our Supreme Court has clarified that "the question is not whether some interpretation of the facts" is potentially covered, but rather whether the "*facts as alleged*" are potentially covered under the insurance policy. *Harleysville*, 364 N.C. at 7, 692 S.E.2d at 611 (emphasis added).

investigation may also be considered," but only "to show that the facts of the claim were within coverage of the policy"); *Waste Mgmt.*, 315 N.C. at 691–92, 340 S.E.2d at 377 (explaining that "[w]here the insurer knows or could reasonably ascertain facts that, if proven, would be covered by its policy," the duty to defend is triggered); *Cox,* 263 N.C. App. at 441, 823 S.E.2d at 625 (considering "pleadings, depositions, answers to interrogatories, and other documents" to ultimately find a duty to defend); *Continental Cas. Co. v. Amerisure Ins. Co.*, 226 F. Supp. 3d 537, 544 (W.D.N.C. 2017), *aff'd in part and vacated in part on other grounds*, 886 F.3d 366 (4th Cir. 2018) (finding that under North Carolina law, an insurer "may look to facts collateral to the allegations against the policyholder to *confirm* a defense obligation, but not to negate one" (emphasis in original)); *New NGC, Inc. v. Ace Amer. Ins. Co.*, 105 F. Supp. 3d 552, 568 (W.D.N.C. 2015) (equating the consideration of evidence outside the pleadings for purposes of determining a duty to defend "to a perfunctory review of the merits of the underlying claims against the insured" which is "not consistent with the duty to defend" under North Carolina law). Thus, the insurer must "investigate and evaluate facts expressed or implied in the [ ] complaint as well as facts learned from the insured and from other sources" when determining its duty to defend obligation, *Waste Mgmt.*, 315 N.C. at 692, 340 S.E.2d at 378, but these facts may only be used "to show the facts of the claim were within coverage of the policy." *Duke Univ.*, 96 N.C. App. at 638, 386 S.E.2d at 764 (citation omitted). Any failure by the insurer to consider known or accessible facts outside the pleadings which, if proven, would

require coverage, puts the insurer at risk of breaching its duty to defend. *Waste Mgmt.*, 315 N.C. at 691, 340 S.E.2d at 377.

## III.    ANALYSIS

43.    Plaintiffs contend that Defendants have breached their duties to defend under the Primary Auto Policies. Plaintiffs argue that, applying the comparison test, the allegations in the Underlying Lawsuits' complaints regarding Plaintiffs' truck operations are clearly, and therefore at least potentially or arguably, covered by the Primary Auto Policies. On the other hand, (a) ORIC argues that the Court should not apply the traditional comparison test because ORIC and Plaintiffs had a unique insurance program under which ORIC has no duty to defend Plaintiffs, (b) ACE argues that the Court should not apply the traditional comparison test because Plaintiffs treated the claims as arising under the Primary CGL Policy, never requested that ACE provide a defense, and defended the Underlying Lawsuits using their own counsel for over five years without involvement from ACE; (c) the claims in the Underlying Lawsuits are not covered because the Underlying Lawsuits do not allege "bodily injury" or "property damage" resulting from the use of a covered "auto"; (d) the Underlying Lawsuits are not covered because they do not allege an "accident" or are excluded by the Expected or Intended Injury Exclusion; (e) coverage for the Underlying Lawsuits is excluded by the Pollution Exclusion; (f) there is no duty to defend under ORIC's Primary Auto Policies and Plaintiffs' have not met the Retention Requirements under the Program Agreement; and (g) there is no duty to defend

because Plaintiffs did not provide prompt notice of the claims under the Primary Auto Policies.

## A. Applicability of the Comparison Test

44. Defendants first argue that this Court should ignore North Carolina's well-established precedent requiring use of the "comparison test" to determine an insurer's duty to defend based on comparison of the allegations in the complaint and insurance policy. Defendants' arguments emphasize the purposefully designed insurance relationship between the parties, which revolved around largely self-funded, self-administered, fully fronted CGL policies accompanied by the Primary Auto Policies at issue, under which neither ORIC nor ACE had a duty to defend.

45. ORIC contends that, rather than relying on a comparison of the complaints in the Underlying Lawsuits and ORIC's Primary Auto Policies, the Court must consider the entire "comprehensive insurance program" which consists of the Primary CGL Policies, Primary Auto Policies, and the Program Agreement. (ECF No. 368, at p. 14.) ORIC argues that "the Motion entirely ignores and contradicts the Program Agreement and the predominant CGL policies." (*Id*. at p. 1.) ORIC further asserts that Plaintiffs neither wanted nor expected a defense from ORIC and intended the insurance program with ORIC to leave defense of all claims, including choice of counsel and litigation strategy decisions, under the exclusive control of Plaintiffs. (*Id*. at pp. 1–2.) ORIC contends that the nature of the relationship created by the Program Agreement relieves them of the duty to defend the Underlying Lawsuits. (*Id*. at p. 14.) However, ORIC cites to no authority, from North Carolina

or any other jurisdiction, supporting the application of this type of duty to defend analysis. Indeed, ORIC does not cite a single North Carolina case that has deviated from a "comparison test" analysis in deciding an insurer's duty to defend.

46. ACE contends that it should not be obligated to provide a defense because Plaintiffs treated the claims as arising under the ACE Primary CGL Policy, never requested that ACE provide a defense, proceeded on their own with defending the Underlying Lawsuits using their own counsel for over five years without any involvement from ACE, and then requested reimbursement of legal costs on the eve of trial. (ECF No. 329, at pp. 16–17.) ACE argues that "[i]n circumstances such as these, a traditional duty to defend analysis simply does not apply. Rather, . . . this situation requires an indemnity analysis rather than a duty to defend analysis." (*Id.* at p. 17.) However, the issue before the Court is whether ACE breached its duty to defend, which is explicitly included in ACE's Primary Auto Policy—not whether ACE has any duty to pay based on the facts as determined at trial. While Plaintiffs likely will seek reimbursement of the defense costs incurred to date based on this Order, this does not transform the Court's "duty to defend" analysis into a much narrower "duty to indemnify" analysis. The Court has thoroughly reviewed the authority cited by ACE in support of its argument (*Id.* at pp. 17–18), and concludes that it is inapposite and does not support ACE's request to apply an indemnity analysis to the duty to defend issue raised by the Motions.

47. The Court, having carefully considered Defendants' arguments, will not deviate from well-established North Carolina authority. The Court believes the

comparison test provides a level of certainty to policyholders regarding their right to a defense if sued, and to insurers regarding their obligations in determining whether they must defend. Therefore, the Court will apply the comparison test; accordingly, any evidence outside of the insurance policies and the allegations in the Underlying Lawsuits may only be considered if it supports coverage. *See Duke Univ.*, 96 N.C. App. at 638, 386 S.E.2d at 764.

## B. "Bodily Injury" or "Property Damage," and Covered "Auto"

48.  ORIC argues that Plaintiffs have "failed to sustain their burden of demonstrating that there was 'bodily injury' or 'property damage' caused by a covered automobile under the [ORIC Primary Auto Policies]." (ECF No. 368, at p. 15.) Specifically, ORIC first argues that Plaintiffs have "cherry-picked" allegations from only one of the Underlying Lawsuits; and second, that the Claimants in the already-tried Underlying Lawsuits did not seek damages for bodily injury. (*Id.*) ORIC makes these arguments despite its acknowledgment in the 2016 Coverage Letters that the Underlying Lawsuits "do allege that the operation of the CAFOs (which include the alleged increase in truck traffic) generally have caused [bodily injury]," and "[t]he [allegations] appear to fit in [the policy's] definition of 'property damage.'" (ECF No. 292.20, at pp. 19–20; ECF No. 292.26, at pp. 15–16.)

49.  First, Plaintiffs indeed rely on the *McGowan* complaint (ECF No. 292.15, at pp. 215–60) for purposes of their argument for coverage. The *McGowan* complaint alleges that Claimants were "embarrass[ed]," "humiliate[d]," "angry, fearful, worried, and depressed" due to the alleged nuisance from Plaintiffs' CAFOs,

and that Plaintiffs' CAFO operations, including the use of trucks, have caused "odor, annoyance, dust, noise" and "bright lights from headlights" resulting in the "loss of use and enjoyment of homesteads." (*Id.* at p. 217, ¶4, pp. 221–23, ¶¶ 33, 36.) Similar, if not identical allegations are made in each of the Underlying Lawsuits. Therefore, the Court is not persuaded that, by choosing to pull allegations from the *McGowan* complaint, Plaintiffs have misrepresented the true nature of the Underlying Lawsuits.[12]

50. Accordingly, comparing the allegations in the *McGowan* complaint to ORIC's Primary Auto Policies, the Underlying Lawsuits at least arguably allege bodily injury and property damage. The allegations of humiliation fit within ORIC's Primary Auto Policies' definition of bodily injury, which specifically includes humiliation. Further, the allegations of embarrassment, anger, worry, fear, and depression arguably constitute forms of mental anguish or mental injury under the ORIC Primary Auto Policies' definition of bodily injury. As to property damage, the allegations of "loss of use and enjoyment of homesteads" are arguably covered given the ORIC Primary Auto Policies' definition of property damage specifically includes "loss of use of tangible property."

51. Second, the fact that the Claimants did not seek damages for bodily injury or property damage at trial is irrelevant to the Court's duty to defend analysis. The duty to defend is measured by the facts as alleged in the pleadings, not what

---

[12] The Court also notes that Defendants do not argue that the duty to defend issue cannot be decided on summary judgment because significant differences in allegations in the Underlying Lawsuits require a case-by-case analysis of the question.

subsequently occurs at trial. *Waste Mgmt.*, 315 N.C. at 691, 340 S.E.2d at 377. Further, evidence outside the pleadings may only be used in a duty to defend analysis to provide for, rather than exclude, coverage. *Duke Univ.*, 96 N.C. App at 638, 386 S.E.2d at 764.

52. Finally, the Underlying Lawsuits contain numerous allegations of injury and damage from Plaintiffs' use of trucks. The Primary Auto Policies provide an exceptionally broad definition of covered "auto." *See supra* ¶ 12. Defendants do not argue that the trucks are not covered autos.

53. The Court, having considered Defendants' arguments, and having compared the complaints in the Underlying Lawsuits to the Primary Auto Policies, is not persuaded that the allegations in the Underlying Lawsuits are not even arguably covered due to the Primary Auto Policies' definitions of bodily injury, property damage, and covered auto.

## C. "Accident" and "Expected or Intended Injury Exclusion"

54. Defendants argue that the claims in the Underlying Lawsuits are not covered because the alleged injuries and property damage were not caused by an "accident" (ECF No. 368, at pp. 16–19; ECF No. 329, at pp. 24–25), and that coverage is excluded under the Expected or Intended Injury Exclusion (ECF No. 368, at pp. 20–21; ECF No. 329, at p. 26). Specifically, Defendants contend that the Underlying Lawsuits are not covered and excluded because the alleged bodily injury and property damage from the CAFOs, including Plaintiffs' truck operations, were "expected or intended."

55.     The Primary Auto Policies do not define the term "accident" but provide that "'[a]ccident' includes continuous or repeated exposure to the same conditions resulting in 'bodily injury' or 'property damage.'" (ECF No. 292.8, at p. 64; ECF No. 292.1, at p. 29)  The Expected or Intended Injury Exclusion states that coverage does not apply for "'[b]odily injury' or 'property damage' expected or intended from the standpoint of the 'insured.'" (ECF No. 292.8, at p. 58; ECF No. 292.1, at p. 23.)

56.     Where an insurance policy does not define a term, the Court applies its plain, ordinary, and accepted meaning. *Williams v. Insurance Co.*, 269 N.C. 235, 238, 152 S.E.2d 102, 105 (1967).  Our Supreme Court has defined "accident" in the context of liability coverage as "an unforeseen event, occurring without the will or design of the person whose mere act causes it; an unexpected, unusual, or undersigned occurrence; the effect of an unknown cause, or, the cause being known, an unprecedented consequence of it; a casualty." *Waste Mgmt.*, 315 N.C. at 694, 340 S.E.2d at 379.  More simply, an "accident" is an event that is "unexpected or unintended" from the standpoint of the insured.  *Cox*, 263 N.C. App. at 444, 823 S.E.2d at 627. Thus, an "accident" under the Primary Auto Policies is an "unexpected or unintended" event from the standpoint of the insured that results in bodily injury or property damage, including that which arises from "continuous or repeated exposure to the same events." Accordingly, in determining whether the alleged injury and property damage were the result of an "accident," the Court must inevitably determine whether the Expected or Intended Exclusion applies. *See Cox*, 263 N.C. App. at 444, 823 S.E.2d at 627 ("When an insurance policy that does not define

'accident' includes an exclusion for acts by an insured that were 'expected or intended,' our analysis does not materially change—because we must determine that an alleged 'bodily injury' was 'unexpected or unintended' by the insured.").

57. In determining whether an event is "expected or intended," the "ultimate focus is on the injury[.]" *Holz-Her U.S. Inc. v. U.S. Fid. & Guar. Co.*, 141 N.C. App. 127, 129, 539 S.E.2d 348, 350 (2000). Thus, an "accident" can involve intentional conduct "if the injury is not intentional or substantially certain to be the result of the intentional act." *Russ v. Great Am. Ins. Cos.*, 121 N.C. App. 185, 188, 464 S.E.2d 723, 725 (1995) (emphasis omitted) (quoting *Stox*, 330 N.C. at 709, 412 S.E.2d at 325). Conversely, there is no "accident" where "the potentially damaging effects of an insured's intentional actions can be anticipated by the insured." *Plum Props., LLC v. N.C. Farm Bureau Mut. Ins. Co.*, 254 N.C. App. 741, 745, 802 S.E.2d 173, 176 (2017).

58. In support of their arguments, Defendants contend that (i) the allegations in the Underlying Lawsuits pertaining to numerous "[s]tudies, reports, incidents and complaints" which Defendants have "amassed" over the years, detail the "predictable nuisance caused by swine sites to nearby neighbors" (ECF No. 368, at pp. 17–18; ECF No. 329, at p. 26); and (ii) the findings of the already-tried Underlying Lawsuits demonstrate Plaintiffs engaged in willful and wanton conduct (ECF No. 368, at p. 19; ECF No. 329, p. 25).

### i. *Studies, Reports, Incidents, and Complaints*

59.     Defendants argue that the allegations in the Underlying Lawsuits establish that Plaintiffs knew injury or property damage was substantially certain to result from Plaintiffs' truck operations. (ECF No. 368, at pp. 17–18; ECF No. 329, at p. 26.) While the Underlying Lawsuits contain allegations that Plaintiffs knew or should have known that their operations of CAFOs would cause nuisance to neighboring residents, none of the Underlying Lawsuits allege that Plaintiffs knew injury or property damage was substantially certain to result *specifically* from Plaintiffs' truck operations. Similarly, the numerous "studies, reports, incidents, and complaints" referenced in the Underlying Lawsuits are not alleged to have detailed predictable nuisance *specifically* from Plaintiffs' truck operations. (*See e.g.*, ECF No. 292.11, pp. 9–13; ECF No. 292.15, at pp. 251–56; ECF No. 292.12, at pp. 23–29.) Furthermore, to the extent Defendants have directed this Court to specific language outside the complaints to the Underlying Lawsuits, the Court may only consider this information to *find* coverage in a duty to defend analysis. *See Duke Univ.*, 96 N.C. App. at 638, 386 S.E.2d at 764 (citations omitted). Nevertheless, the complaints in the Underlying Lawsuits also contain allegations of "negligence" and "reckless disregard" with respect to the operation of the CAFOs, resulting in nuisance. *See supra* ¶ 8. Therefore, the Court is not persuaded that the allegations in the Underlying Lawsuits establish that the Plaintiffs "expected or intended" the injuries and property damage from their truck operations—at least not to the extent that

these allegations would be considered not even arguably covered by the Primary Auto Policies.

### ii. Findings in the already-tried Underlying Lawsuits

60. Defendants argue that Plaintiffs have failed to meet their burden of establishing an accident because punitive damages awards by juries in the already-tried Underlying Lawsuits required a showing of willful conduct. (ECF No. 368, at p. 19; ECF No. 329, at p. 25.) Defendants contend that the juries' findings show that Plaintiffs' acts were willful (*i.e.*, intentional), and that Plaintiffs knew of (*i.e.*, expected) the nuisance caused by its CAFOs, including the truck operations. (*Id.*) However, the fact that a jury found Plaintiffs engaged in willful and wanton conduct is irrelevant to this Court's duty to defend analysis. A duty to defend analysis is limited to the facts as alleged in the pleadings, not the facts as they are determined at trial. *Waste Mgmt.*, 315 N.C. at 691, 340 S.E.2d at 377.

61. Therefore, the Court, having considered Defendants' arguments, and having compared the allegations in the Underlying Lawsuits to the Primary Auto Policies, is not persuaded that the allegations are not even arguably covered due to the Primary Auto Policies' definition of "accident" or the Expected or Intended Injury Exclusion.

### D. The Pollution-related Provisions

62. Defendants next argue that coverage for the claims raised in the Underlying Lawsuits is excluded by the Pollution Exclusion in the Primary Auto Policies. A duty to defend is "determined by the language of an insurance contract."

*Brown*, 326 N.C. at 392, 390 S.E.2d at 153. Thus, general rules of construction which govern the interpretation of insurance policy provisions apply to the Court's determination of whether the Pollution Exclusion excludes coverage, and conversely, whether the Pollution Endorsement affords coverage. *See Stox*, 330 N.C. at 702, 412 S.E.2d at 321. Accordingly,

> [t]hose provisions in an insurance policy which extend coverage to the insured must be construed liberally so as to afford coverage whenever possible by reasonable construction. However, the converse is true when interpreting the exclusionary provisions of a policy; exclusionary provisions are not favored and, if ambiguous, will be construed against the insurer and in favor of the insured.

*Id.* (citations omitted).

63. "When the language of the contract is clear and unambiguous, construction of the agreement is a matter of law for the court and the court cannot look beyond the terms of the contract to determine the intentions of the parties." *Bank of Am., N.A. v. Rice*, 230 N.C. App. 450, 456, 750 S.E.2d 205, 209 (2013); *see also Lynn v. Lynn*, 202 N.C. App. 423, 431, 689 S.E.2d 198, 205 (2010). "Whether or not the language of a contract is ambiguous . . . is a question for the court to determine." *Lynn*, 202 N.C. App. at 432, 689 S.E.2d at 205 (citation omitted).

64. The parties argue two very different constructions of the Pollution-Related Provisions contained in the Primary Auto Policies. Plaintiffs argue that the unambiguous language of the Primary Auto Policies establishes that the Pollution Endorsement overrides the Pollution Exclusion and makes the Pollution Exclusion applicable only to claims for pollution-related injury or damage arising from "liability

assumed [by Plaintiffs] under a contract or agreement." (ECF No. 290, pp. 19–20; ECF No. 294, pp. 18–19.) Since there is no claim in this case that Plaintiffs are seeking coverage for liability assumed by Plaintiffs under a contract, Plaintiffs contend that the Primary Auto Policies cover the claims in this case even if the noise, light, or other alleged nuisance caused by Plaintiffs' trucks is considered a "pollutant."

65. Defendants, on the other hand, argue that the Pollution Endorsement only broadens coverage to the extent coverage already exists under the Second Coverage Grant for a "covered pollution cost or expense" involving clean-up of pollutants or lawsuits brought by governmental authorities resulting from pollutants. Therefore, Defendants contend that coverage for the claims for bodily injury and property damage alleged by the Claimants in the Underlying Lawsuits are excluded from coverage because the Underlying Lawsuits allege injuries and damage caused by "pollutants" emanating from Plaintiffs' trucks and not arising from clean-up of pollutants or a governmental lawsuit. (ECF No. 368, at p. 21–22; ECF No. 329, at p. 27.) However, Defendants do not provide an explanation of how they construct the Pollution-Related Provisions to reach this conclusion, and the Court is left to speculate as to their interpretation. Nevertheless, the Court will address the construction of the Pollution-Related Provisions in the Primary Auto Policies.

66. Following thorough review of the language of the Pollution-Related Provisions, the Court reads the relevant provisions in the following order to arrive at a conclusion as to their proper construction: (1) the First Coverage Grant (ECF No.

292.8, at p. 57; ECF No. 292.1, at p. 22); (2) the Second Coverage Grant (*Id*.); (3) the definition of "covered pollution cost or expense" (ECF No. 292.8, at p. 65; ECF No. 292.1, at p. 30); (4) the Pollution Exclusion (ECF No. 292.8, at pp. 59–60; ECF No. 292.1, at pp. 24–25); (5) the definition of "pollutant" (ECF No. 292.8, at p. 66; ECF No. 292.1, at p. 31); and (6) the Pollution Endorsement (ECF No. 292.8, at p. 169; ECF No. 292.1, at p. 96).

67. The First Coverage Grant, generally, provides coverage for bodily injury or property damage claims caused by an accident resulting from use of a covered auto. (ECF No. 292.8, at p. 57; ECF No. 292.1, at p. 22.) The Second Coverage Grant, generally, provides coverage for a "covered pollution cost or expense" (*Id*.), which is defined as a "request, demand, order or statutory or regulatory requirement" or a "claim or suit by or on behalf of a government authority" for, essentially, clean-up as a result of an accident involving "pollutants." (ECF No. 292.8, at p. 65; ECF No. 292.1, at p. 30.) The Pollution Exclusion, generally, excludes coverage for bodily injury or property damage claims involving "pollutants." (ECF No. 292.8, at pp. 59–60; ECF No. 292.1, at pp. 24–25.) A "pollutant," is defined as a "solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (ECF No. 292.8, at p. 66; ECF No. 292.1, at p. 31.) Finally, the Pollution Endorsement, *inter alia*, limits the application of the Pollution Exclusion only to circumstances where liability for bodily injury or property damage claims due to pollutants is assumed by Plaintiffs "under a contract or agreement." (ECF No. 292.8, at p. 169; ECF No. 292.1, at p. 96.) In other words, the Pollution

Endorsement *eliminates the exclusion* of claims for injury or damage caused by pollutants except where the liability arises solely because of Plaintiffs' contractual assumption of the liability, and broadens coverage under the Primary Auto Policies to claims for bodily injury and property damage caused by pollutants.

68. Applying this construction, the Underlying Lawsuits allege "bodily injury" or "property damage" claims—not "clean-up" claims. For example, the allegation that "[l]arge hog trucks carry hogs into and out of the facilities" causing "odor, annoyance, dust, noise and loss of use and enjoyment of homesteads" which "embarrasses and humiliates the [Claimants]" (ECF No. 292.15, at pp. 221–22, ¶ 33) does not involve a "request, demand, order or statutory or regulatory requirement" or a "claim or suit by or on behalf of a government authority" for "clean-up" of "pollutants." Rather, the allegations in the Underlying Lawsuits fall squarely under the coverage afforded by the First Coverage Grant for claims involving bodily injury or property damage. Not only is this construction clear and unambiguous, but it falls in line with ORIC's own analysis in its 2016 Coverage Letters. (ECF No. 292.20, at pp. 22–23; ECF No. 292.26, at p. 17.)

69. The Court has carefully studied the relevant provisions of the Primary Auto Policies and concludes that the language is unambiguous. The Pollution Endorsement modifies the Pollution Exclusion so that the Primary Auto Policies provide coverage for bodily injury and property damage caused by pollutants. Accordingly, the allegations in the Underlying Lawsuits involving "pollutants"

caused by Plaintiffs' truck operations are, at the very least, arguably covered under the Primary Auto Policies.

70. Finally, regardless of the Court's construction of the Pollution-Related Provisions of the Primary Auto Policies, the allegations in the Underlying Lawsuits of bodily injury or property damage caused by noise and lights from Plaintiffs' truck operations arguably are not excluded from coverage by the Pollution Exclusion. "Pollutants" are defined under the Primary Auto Policies as "solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (ECF No. 292.8, at p. 66; ECF No. 292.1, at p. 31.) While it may be possible for noise or light to be considered pollutants, an argument to the contrary is equally plausible, and this Court construes exclusions to coverage "strictly . . . to provide coverage." *Trust Co.*, 276 N.C. at 355, 172 S.E.2d at 522–23. Therefore, even adopting Defendants' construction of the Pollution-Related Provisions, the Underlying Lawsuits raise potentially covered claims not subject to the Pollution Exclusion and, therefore, these claims trigger a duty to defend.

## E. The Program Agreement and ORIC's Primary Auto Policies

71. ORIC argues that "Smithfield must demonstrate that it has satisfied its retention obligations under the Program Agreement before [ORIC] can have any obligation to pay toward defense or participate in Smithfield's defense." (ECF No. 368, at pp. 19–20.) The Court is not persuaded by ORIC's argument. ORIC does not contend that the Program Agreement contains express language requiring Plaintiffs to pay the retention before ORIC has a duty to defend under the Primary Auto

Policies, nor does it cite any authority supporting its contention that an insured must pay a retention in order for an insurer to have a duty to defend. (*Id.*) Finally, there is no evidence that ORIC ever asked Plaintiffs to pay the retention or that Plaintiffs have refused such a request.

### F. Notice of the Underlying Lawsuits

72. ACE argues that Plaintiffs' notice to ACE regarding the Underlying Lawsuits was improper, and therefore ACE is relieved of its duty to defend. Specifically, ACE argues that (a) Plaintiffs never explicitly requested a defense (ECF No. 329, at p. 16) and, (b) that despite receiving notice of the Underlying Lawsuits, ACE was not provided "immediate notification" of the accident as an auto liability claim, as required by the insurance policy.[13] (ECF No. 329, at pp. 16–17.)

73. Under North Carolina law, the duty to defend "arises when an insurer receives actual notice of the underlying action." *Kubit*, 210 N.C. App. at 293, 708 S.E.2d at 154. Absent any notice requirements in the insurance policy, the duty to defend is not contingent upon any explicit demand or request. *See Med. Mut. Ins. Co. v. Am. Cas. Co.*, 721 F. Supp. 2d 447, 463 (E.D.N.C. 2010) (explaining that aside from providing "written notice during the policy period of a claim for damages," as required by the policy, "there was nothing else for [the plaintiff] to do to receive the benefit of a defense"); *St. Paul Fire & Marine Ins. Co. v. Hanover Ins. Co.*, 2000 U.S. Dist. LEXIS 21792, at *25–26 (E.D.N.C. 2000) ("[T]here is no requirement in the . . . policy or in any reported North Carolina case, that an insurer's defense obligation is contingent

---

[13] ACE also argued that a duty to indemnify rather than a duty to defend analysis is warranted, which the Court has previously addressed and rejected. *See supra* ¶¶ 46–47.

upon an insured's explicit request, made directly to the insurer, that the insurer provide a defense.").

74.     Upon receiving actual notice of the underlying lawsuit against its insured, an insurer has three options:

> (1) seek a declaratory judgment regarding its obligations before or pending trial of the underlying action, (2) defend the insured under a reservation of rights, or (3) refuse either to defend or to seek a declaratory judgment at the insurer's peril that it might later be found to have breached its duty to defend.

*Imperial Casualty & Indem. Co. v. Radiator Specialty Co.*, 862 F. Supp. 1437, 1441 (E.D.N.C. 1994) (quoting *St. Paul Fire & Marine Ins. Co. v. Vigilant Ins. Co.*, 724 F. Supp. 1173, 1182 (M.D.N.C. 1989)).   While an insurer is not obligated to defend allegations that are not within or excluded from the policy, *Waste Mgmt.*, 315 N.C. at 691, 340 S.E.2d at 377, a "refusal to defend is unjustified even if it is based upon an honest but mistaken belief that the claim is not covered." *Duke Univ.*, 96 N.C. App. at 637, 386 S.E.2d at 764.

75.     First, ACE's Primary Auto Policy does not require any explicit demand or request by the insured that the insurer provide a defense.  ACE admits that it received notice of the Underlying Lawsuits under its Primary CGL Policy, and that ACE was eventually provided notice under its Primary Auto Policy.  Therefore, "there was nothing else . . . to do to receive the benefit of a defense." *Med. Mut. Ins. Co.*, 721 F. Supp. 2d at 463.

76.     Second, ACE was first notified of the Underlying Lawsuits pending in state court on July 19, 2013.  These "First Reports of Loss" were sent to both ORIC

and ACE, and while they were only reported under the Primary CGL Policies, they also included language stating "[t]his matter is reported under any and all applicable policies *whether or not cited.*"  (ECF No. 292.25, at p. 5; ECF No. 292.23, p. 5 (emphasis added).)  There were roughly four months between the initial First Report of Loss and the subsequent notice provided to ACE under its Primary Auto Policy in November 2013.  These facts, taken together, do not even arguably demonstrate that ACE was prejudiced by late notice of the Underlying Lawsuits.  Upon receiving the initial notice letter from Plaintiffs in July 2013, ACE was sufficiently notified of the claims under *any and all* applicable policies issued by ACE, whether or not cited.  *See New NGC, Inc.*, 105 F. Supp. 3d at 570 (explaining that the insured was "only required to comply with the requirements provided in the insurance contract" and "it was up to [the insurer] to review the underlying suits and determine what obligations it may owe to [the insured] under any and all applicable policies issued by [the insurer], whether cited by [the insured] or not").

77.    Therefore, the Court is not persuaded that ACE is relieved of any duty to defend because of Plaintiffs' failure to request a defense, or due to late notice of the Underlying Lawsuits.

**F. Conclusion**

78.    The Court, having considered Defendants' arguments, the undisputed facts, and applicable law, finds that the Plaintiffs' have established that a duty to defend exists under Defendants' Primary Auto Polices and that the Underlying

Lawsuits are arguably covered under said policies.  Therefore, Defendants' failure to provide a defense constitutes a breach of their respective duties to defend.

THEREFORE, IT IS ORDERED that Plaintiffs' Partial Summary Judgment Motion against ORIC and Plaintiffs' Partial Summary Judgment Motion against ACE are GRANTED.

SO ORDERED, this the 22nd day of December, 2020.


/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge for
Complex Business Cases